UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| IMELDA I. POGANY,<br><br>                  Plaintiff,<br><br>       vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                  Defendant. | 4:18-CV-04103-VLD<br><br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Imelda I. Pogany, seeks judicial review of the Commissioner's

final decision denying her application for social security disability,

supplemental security income disability benefits, and widow's insurance

benefits under the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Pogany filed her application for both types of benefits. AR20, 308, 315. Her coverage status for SSD benefits expires on June 30, 2021. AR21. In other words, in order to be entitled to Title II benefits, Ms. Pogany must prove disability on or before that

Ms. Pogany has filed a complaint and has requested the court to reverse the Commissioner's final decision denying her disability benefits and to enter an order awarding benefits. Alternatively, Ms. Pogany requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Statement of the Case

This action arises from plaintiff, Imelda I. Pogany's ("Ms. Pogany"), application for SSDI, SSI and Widow's Insurance Benefits filed on August 17, 2015, alleging disability since November 12, 2014, due to PTSD, depression, anxiety, knee pain, and chronic sacroiliac pain. AR308, 315, 325, 409, 430 (citations to the appeal record will be cited by "AR" followed by the page or pages).

---

date. Ms. Pogany also applied for disabled widow's benefits under Title II. In order to be entitled to those benefits, Ms. Pogany is required to show that: (1) she is disabled; (2) she has attained the age of 50; and (3) that her disability began on or before July 31, 2019. AR20, 23. See also, Woodard v. Schweiker, 668 F.2d 370, 372 (8th Cir. 1981) (explaining the required elements for obtaining disabled widow's benefits).

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 18). The court has made only minor grammatical and stylistic changes.

Ms. Pogany's claim was denied initially and upon reconsideration. AR184, 189, 194, 202, 209, 216. Ms. Pogany then requested an administrative hearing. AR223.

Ms. Pogany's administrative law judge hearing was held on November 8, 2017, by Richard Hlaudy ("ALJ"). Ms. Pogany was represented by other counsel at the hearing, and an unfavorable decision was issued on February 6, 2018. AR17, 42.

At Step One of the evaluation, the ALJ found that Ms. Pogany was insured for benefits through June 30, 2021, and that she was the unmarried widow of the deceased insured worker and met the non-disability requirements for disabled widow's benefits with the prescribed period ending on July 31, 2019. AR23.

At Step One of the evaluation, the ALJ also found Ms. Pogany had engaged in substantial gainful activity, ("SGA"), from February 2015, through September, 2015, and found that the earliest possible onset date was October 1, 2015. AR23-24.

At Step Two, the ALJ found that Ms. Pogany had severe impairments of lumbar degenerative disc disease; tricompartmental arthritis, left knee; anxiety disorder; PTSD; depressive disorder; and narcotic dependence. AR24.

The ALJ also found that Ms. Pogany had shown on exam in August 2016, multiple fibromyalgia trigger points, and had undergone trigger point injections, but found that a "clear diagnosis of fibromyalgia" is not reflected in the record, and consistent with SSR 12-2p found that fibromyalgia was not a

medically determinable impairment.  Id.  The ALJ then stated, "However, given the claimant does have 'severe' impairments that would reasonably result in pain, the totality of her pain complaints is considered as it relates to her maximum residual functional capacity."  AR24-25.

At Step 3, the ALJ found that Ms. Pogany did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR § 416.920(d), 416.925, and 416.926) (hereinafter referred to as the "Listings").  AR25.  The ALJ considered the mental impairments under Listings 12.04, 12.06, and 12.15 and found that Ms. Pogany had mild limitations in understanding, remembering or applying information, moderate limitations in interacting with others, moderate limitations with concentration, persistence or maintaining pace, and moderate limitations in adapting or managing herself, so did not meet a Listing.  AR25-26.  The ALJ also considered Listing 1.04, but found that imaging studies did not reflect a compromise or compression of the nerve root or spinal cord.  AR25.

The ALJ determined Ms. Pogany had the residual functional capacity, ("RFC"), to perform:

> less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  The claimant is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  She can stand and/or walk for 6 hours in an 8-hour workday and can sit for 6 hours in an 8-hour workday.  The claimant is limited to occasionally climbing ramps/stairs but can never climb ladders/ropes/scaffolds.  The claimant can occasionally stoop, kneel, crouch and crawl.  She must avoid even moderate exposure to workplace hazards.  Secondary to her mental impairments, the claimant is limited to performing simple, routine tasks.  She can

tolerate occasional and superficial contact with coworkers and the public.

AR27.

The ALJ's subjective symptom finding was that Ms. Pogany's medically determinable impairments could reasonably be expected to produce the symptoms she alleged, but her statements concerning the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR28.

The ALJ considered the opinions of the State agency psychological consultants and gave them "little weight." AR31.

The ALJ considered the opinions of the State agency medical consultants, and gave them "greater weight" compared to the "little weight" given the psychological consultants. Id. The ALJ stated they were given greater weight because they were generally consistent with the RFC, and the "modest objective findings, medication compliance, daily activities, and ongoing work support that she has such capacity." Id.

The ALJ considered the medical source statement completed by Ms. Pogany's former primary care provider, Michael Schurrer, MD, who supported Ms. Pogany's application for disability several times, noting work only aggravates her back pain and psychiatric issues, and she is not physically and emotionally able to work fulltime, and gave his opinions "little weight." AR31. The ALJ stated Dr. Schurrer raised concerns numerous times with the claimant's substance abuse, and his opinions did "not account for this," the

objective findings regarding the claimant's physical impairments are quite limited, and her mental health has been "more or less stable" per evidence of record. Id.

The ALJ considered the medical source statement completed by Ms. Pogany's new primary care provider, Scott Hiltunen, MD, who opined that Ms. Pogany could lift 20 pounds occasionally and 10 pounds frequently, but only stand 2 hours in an 8-hour workday, sit less than 6 hours in an 8-hour workday, never push/pull with the left leg, climb ladders/scaffolds, stoop, or kneel, rarely climb ramps/stairs, balance, crouch, and frequently reach, handle, finger, and feel, and gave the opinions only "some weight." Id. The ALJ stated he "accepts the general conclusion the claimant can perform a range of light work, other limitations- such as inability to push/pull with the left leg – are not consistent with her modest treatment." Id.

The ALJ also considered Dr. Hiltunen's medical source statement regarding Ms. Pogany's mental limitations who opined that she had moderate limitations in understanding, remembering, and carrying out detailed instructions, maintaining concentration for extended periods, completing a normal workday or workweek without interruption from psychologically based symptoms, and performing at a consistent pace and gave the opinions "some weight." The ALJ stated they were not entirely inconsistent with the RFC and tended to reflect the claimant's current mental ability, but he rejected Dr. Hiltunen's opinion that the claimant would have excessive absenteeism or require excessive breaks asserting it was not supported by the record, and the

RFC's reduction to simple, routine work would allow her to maintain appropriate persistence and pace.  AR31-32.

The ALJ considered a series of opinions given by Kelli Rockafellow/Willis, MSW, CSW-PIP, who stated Ms. Pogany's medical and mental health hinders her ability to maintain full-time employment, and that Ms. Pogany was unable to maintain a full-time job due to ongoing mental and physical health issues, and found the statements to be "vague and unclear" but did not state what weight was given to the opinions, if any.  AR32.

The ALJ stated that the RFC he determined was supported by the "modest objective evidence, the stability of the claimant's treatment, the overlay of substance dependence, her ongoing work, and her daily activities.  Id.

The ALJ's decision includes no finding regarding the "materiality" of the asserted "overlay of substance dependence" or the asserted severe narcotic dependence impairment.  AR17-41.

Based on the RFC determined by the ALJ, the ALJ found that Ms. Pogany was not capable of performing her past relevant work.  AR32.

At Step 5, relying on the testimony of a vocational expert ("VE"), the ALJ found Ms. Pogany capable of adjusting to other work that existed in significant numbers such as garment sorter, DOT# 222.687-014; laundry worker, DOT# 361.687-014; and hotel housekeeper, DOT# 323.687-014, relying on testimony from the VE regarding the number of jobs available for each occupation nationally.  AR33.

Ms. Pogany timely requested review by the Appeals Council through her current counsel on March 6, 2018. AR304. Counsel in the request for review had requested access to the e-file and additional time following access to submit additional evidence and argument. Id.

**B.     Plaintiff's Age, Education and Work Experience**

Ms. Pogany was born August 4, 1964, and completed the 12th grade in 1984. AR88, 410.

Ms. Pogany reported working as a cashier and a medical transcriptionist (AR417) and the VE listed the same jobs on his work report (AR503), and the ALJ in the decision failed to identify Ms. Pogany's past relevant work, but concluded she was unable to perform it. AR32.

**C.     Relevant Medical Evidence**

**1.     Avera McGreevy Clinic Records: Physician and Chart Notes**

The earliest treatment notes from Avera McGreevy where Ms. Pogany received her primary care from Michael Schurrer, MD, was an exam on August 11, 2014, when she was seen for ongoing back pain. AR1070. She had already received a nerve block injection and another was being considered, and she was using a TENS unit, doing stretching, and her medications included oxycodone, gabapentin, lorazepam, meloxicam, methocarbamol, trazodone, and citalopram (Celexa). AR1070-71. The history notes a desire to reduce hydrocodone use and a report that the Celexa helped, but not enough. AR1070. Examination revealed tenderness in the back at L4-S1 area both mid and paraspinal. AR1072. Examination also revealed no deformity of

Ms. Pogany's back and she moved around "much more freely" with intact motor and sensory function.  Id.  The assessment was acute exacerbation of chronic low back pain.  AR1073.  Dr. Schurrer discussed weaning off her daily hydrocodone dose, but hydrocodone/acetaminophen was listed as a new medication.  Id.  By August 15, 2014, Dr. Schurrer noted that her taper of medications for low back pain was doing well and Ms. Pogany was anxious to try to drop the dose more.  AR1066.

Ms. Pogany saw Dr. Schurrer on August 18, 2014, and had injured her back when she was pulled on the ground by her dog while walking it.  AR1062.  She was referred to Dr. Lockwood at the pain clinic.  AR1065.

A chart note from August 18, 2014, indicated that Ms. Pogany was scheduled for a lumbar injection with Dr. Lockwood on August 20, 2014.  AR1499.  There is also a single record from Orthopedic Institute for August 6, 2014, where Dr. Mitch Johnson stated that Ms. Pogany had already undergone a lumbar injection by Dr. Scott Lockwood at Avera McKennan Hospital.  AR504, 793 (Avera Hospital record documenting the injection on referral from Dr. Mitch Johnson and a history of prior back pain and injections).

Ms. Pogany saw Dr. Schurrer on August 22, 2014, and she reported poor pain relief, and had increased her use of oxycontin.  AR1058.  Examination revealed back tenderness, pain with straight leg raise at 50 degrees, and pain limiting ambulation on toes and heels.  AR1060.  She had no deformity of the back and her sensation and reflexes were intact.  Id.  Her oxycontin dosage was increased back to the higher dose.  AR1061.

Ms. Pogany saw Dr. Stotz on August 29, 2014, with ongoing back pain and had tweaked her back and was out of her Percocet which she used for breakthrough pain. AR1054. She was given a Toradol shot, and a few Percocet tablets. Id.

The next exam record in the appeal file is for October 6, 2014 (AR1455), but a September 17, 2014, chart note stated that "FMLA" paperwork was completed "which is reasonable as she has multiple issues that would create problems with her working. At this time we are putting her off as of 9/14/14 thru 9/22/14 see form."[3] AR1494.

Ms. Pogany saw Dr. Schurrer on October 6, 2014, and reported a fall re-injuring her back the prior week, which caused her to miss work. AR1455. She reported her mood had been improving, but she became more nervous over the weekend and consequently her pain increased. Id. Examination revealed tenderness in her back and slowed movement with guarding. AR1458. She was able to bend over and touch her toes and her motor sensory functions were intact. Id. Her oxycodone medication was changed. Id. She was seen again on October 13, 2014, and had aggravated her back while bending to pick up her phone. AR1450. Dr. Schurrer stated that Ms. Pogany asked to go back on oxycontin, but he said no, it would just continue the cycle of narcotics dependence. AR1453. He stated she would continue to have chronic pain and

---

[3] The FMLA form referenced does not appear in the Appeal Record. AR1494.

that was the reason for the pain management group referral, and she was rescheduled after missing an appointment.  Id.

Ms. Pogany saw Dr. Schurrer on October 22, 2014, for the initiation of counseling sessions, and he stated he was waiting for Dr. Stanley to review Ms. Pogany's psych meds, and he learned more about Ms. Pogany's social and economic situation and stated "she will need work adjustment."  AR1443.  Ms. Pogany described her pain as "ok."  AR1440.

Dr. Stanley from mental health reviewed Ms. Pogany's medications on October 29, 2014, and recommended Mirtazapine and a reduction in Bupropion.  AR1487.

Ms. Pogany contacted the clinic on October 29, 2014, and was very tearful; her car had broken down, she was not sleeping, and was having very severe PTSD flashbacks.  AR1488.

Ms. Pogany contacted the clinic on October 30, 2014, and inquired about FMLA to take some time off to "get her head together."  AR1486.  She reported being "on a ledge" and she was encouraged to go in for a psychological assessment.  Id.  She said she had no plans to harm herself and was just stressed.  Id.

Ms. Pogany contacted the clinic on November 10, 2014, because the paperwork for FMLA and short-term disability had not been received yet, and the papers[4] were scanned and sent to the appropriate agencies.  AR1483-84.

_____

[4] The referenced FMLA and short-term disability papers do not appear in the Appeal Record.

Ms. Pogany saw Dr. Schurrer on November 11, 2014, for an exacerbation of her back pain with radiation down the left leg, and reported her stress was a bit more due to work pressure on her and some delay in getting FMLA papers to her, and she was taking all her meds to the max four times per day. AR1426. Examination revealed Ms. Pogany was visibly uncomfortable with movement and straight leg raise to about 60 degrees, prominent diffuse tenderness in the back extending into the glutes and trochanter area, and she was limited with LLE strength in all aspects with a lot of pain. AR1428. Her sensation was "ok" and her hip range of motion was intact. Id. She was referred for a neurosurgery opinion, sent to Dr. Lockwood for a possible additional injection, and her pain med was changed to hydromorphone. AR1429. Ms. Pogany saw Dr. Schurrer on November 17, 2014, while waiting to get into her referrals with ongoing pain and Dr. Schurrer noted it was a difficult dilemma as more pain medication "will worsen psych issue and caution about too much psych med" and he left her medications unchanged. AR1422. Dr. Schurrer also noted Ms. Pogany's pain seemed to be "reasonably controlled." Id.

Ms. Pogany saw Dr. Schurrer on November 21, 2014, and had fallen six days earlier and was taking her regular meds and some extra oxycodone. AR1408. Examination revealed back tenderness and limited straight leg raise at 50-60 degrees. AR1411. Examination of the extremities revealed intact pulses, no edema, and normal color, temperature, and sensation. AR1411. Dr. Schurrer continued medications while waiting for pain clinic and

neurosurgery, and felt she would always have pain and part of it was anxiety driven so he doubled her lorazepam dosage.  AR1412.

Ms. Pogany saw Dr. Schurrer on November 25, 2014, but saw someone before her appointment with Dr. Schurrer who discussed her upcoming rhizotomy procedure.  AR1407.  She reported to Dr. Schurrer the injection she had received the day before had helped but now symptoms had escalated a bit.  AR1395.  Her mood was "ok" and her tailbone was doing better.  Id.  Examination revealed she was visibly uncomfortable with slow movement, her back was intact, and she had no swelling or edema.  AR1399.  Her pain medications were increased pending the rhizotomy scheduled the next week.  Id.

Ms. Pogany saw Dr. Schurrer on December 8, 2014, following her rhizotomy procedure and she had ended upon staying the hospital for pain control and she reported continued anxiety and depression issues.  AR1378.  On examination, she had two very small puncture sites on the lower left lumbar spine, but her back was otherwise normal without any swelling, discoloration, or drainage.  AR1383.  Her extremities were within normal limits and her motor and sensory function were intact.  Id.  Ms. Pogany saw Dr. Schurrer on December 16, 2014, and reported that her back had been slowly getting better, but she had fallen on the ice the prior day and was still and sore on her left neck and shoulder.  AR1367.  She was ambulatory and denied any other focal neurological symptoms.  Id.  On examination, her lower lumbar spine and left gluteal were tender, but without deformity, swelling, or

discoloration. AR1372. Ms. Pogany's extremities were also non-tender with normal range of motion and her motor and sensory function were intact in the arms and legs. Id. By December 23, 2014, when she saw Dr. Schurrer she reported some diffuse low back pain but no radicular pain, and her pain was worse with activity. AR1354. She said that overall her pain was doing well, and that she was taking about four oxycodone per day. Id. On examination, Ms. Pogany's back range of motion was normal and her motor and sensory function were intact. AR1359. Dr. Schurrer felt her sciatica or nerve pain was gone, and only her chronic diffuse lower back pain was left and he continued to taper down her narcotics. Id.

Ms. Pogany saw Dr. Schurrer on January 6, 2015, and was using oxycodone 2-4 times per day for pain along with a heating pad and stretching. AR1343-44. She said she was "doing ok" with oxycontin and "pretty well" overall. Id. On examination, her back had some mildly diffuse tenderness and her motor and sensory function were intact. AR1348. Dr. Schurrer encouraged her to continue to taper down the oxycontin and he stated that he felt "emotional issues are more important right now and caution when she returns to work." Id.

Ms. Pogany saw Dr. Schurrer on January 13, 2015, and she reported increased narcotic use of 5 pills per day, and Dr. Schurrer was concerned over her pattern of dependence and felt treatment with a Methadone program may be needed. He stated "Unfortunately there is a significant connection with her psychologic frame of mind also." AR1337. On examination, Ms. Pogany was in

no acute distress and her back was tender, but without deformity or any real focal findings.  Id.

Ms. Pogany saw Dr. Schurrer on January 27, 2015, and was to return to work in five days and she was very anxious to the point the prior day she had vomited, and her pain was stable with good and bad days.  AR1319.  On examination, she appeared comfortable and moved about freely.  AR1324.  Her back was the same with some mild tenderness, but intact range of motion.  Id.  Her motor and sensory function were intact.  Id.  Ms. Pogany phoned the clinic later and reported severe anxiety and was told to take additional lorazepam. Id.  Dr. Schurrer stated, "I thought this might happen when it was time to return to work.  I think her psychy [sic] is to [sic] fragile for her to return to work."  Id.  Dr. Schurrer stated, "...returning to the same job will only magnify her problem and I'm not sure there is enough of any medication that is going to control her situational anxiety.  She may be looking at disability due to psych reasons."  Id.

Ms. Pogany saw Dr. Schurrer on February 9, 2015, and had been back to work eight days and was having low back pain despite taking 5-6 oxycodone per day and was taking 2-3 clonazepam per day.  AR1308.  She said that overall, she had a lot of stress but was "doing ok."  Id.  On examination, her back was tender, her straight leg raises were negative, and her motor and sensory function were intact.  AR1313.  Dr. Schurrer told Ms. Pogany that she may need to look at alternate work or with her psychiatric problems, not working.  Id.  He also stated he felt she did have narcotic dependence at that

time, and recommended chemical dependency treatment, Methadone program, or ongoing narcotics via Dr. Cho.  Id.

Ms. Pogany saw Dr. Schurrer on February 18, 2015, and again on March 4, 2015, and she was doing better, having reduced to two oxycodone per day and handling work better.  AR1283, 1295.  But by March 9, 2015, had gotten worse pain and had taken more Percocet for a couple of days and then threw them away out of fear of falling back to taking too many.  AR1274.  On examination, her back was tender, her straight leg raises were negative, and her motor and sensory function were intact.  AR1279.  Dr. Schurrer said no to any more narcotics and also to Tramadol due to the psych drugs she was taking.  Id.  Ms. Pogany was scheduled to see Dr. Cho for pain management.  AR1469.

Ms. Pogany contacted the clinic on April 3, 2015, and had just left the emergency room and expressed frustration at the care given and also stated she was not planning to see Dr. Cho again because she did not feel Dr. Cho "has time for her or cares."  AR1467.

Ms. Pogany saw Dr. Schurrer on April 6, 2015, after a fall and wanted to discontinue treatment with Dr. Cho, had quit her job, and Dr. Schurrer continued to emphasize her psychiatric issues, but Oxycontin was prescribed.  AR1265.  Dr. Schurrer noted that this was "another story how she fell walking her dog with no apparent physical findings of significant injury.  Patient does have definite addiction issues with dependence."  Id.  Even when

Ms. Pogany's pain was under control, she continued to take narcotics that were prescribed on a per needed basis. AR1265. Because she lost her job her medical insurance was going to end. AR1467.

Ms. Pogany saw Dr. Schurrer on May 22, 2015, and reported a headache and body aches, and she had run out of Oxycontin because she threw them away, and was out of clonazepam because she could not afford the refill, and she had been drinking 2-5 whiskeys per day. AR1215. She was observed to move about freely with a slight limp, and a low dose of Tramadol was prescribed. AR1220. On examination, Ms. Pogany made good eye contact, her cranial nerves were intact, and she appeared more angry than depressed. Id.

Ms. Pogany saw Dr. Schurrer on June 15, 2015, and reported back pain, getting a 2nd job with HyVee, being on her feet up to 10 hours per day, and tapering off two psych meds due to cost issues. AR1200. She denied any symptoms of depression. Id. On examination, Ms. Pogany moved about freely, her back was tender, her straight leg raises were negative, and her motor and sensory function were intact. AR1205. Dr. Schurrer felt she sabotaged herself by stopping the psych meds and taking on more work. Id. He stated that she did not notice an abrupt change after stopping her psych meds because it can take weeks to totally eliminate the effect and again stated, "Her mental health and trauma she has gone through in my opinion is the biggest reason she has gotten into chronic med abuse and dependence." Id.

Ms. Pogany saw Dr. Schurrer on July 6, 2015, and reported working two jobs with over 40 hours per week, and apparently wanted more pain

medication, but Dr. Schurrer said she needed to adjust her schedule to not stress her situation. AR1186, 1191. On examination, her back was tender, her straight leg raises were negative, she appeared alert and comfortable, and her motor and sensory function were intact. Id.

Ms. Pogany was seen at the clinic on July 22, 2015, and reported she was going down her stairs and her left leg felt numb, gave out and she fell and had neck and left gluteal pain. AR1180. On examination, Ms. Pogany had no gross deformities of her extremities, her cranial nerves were intact, and she had 5/5 strength in both her upper and lower extremities. AR1181. She was given Ultram for the pain associated with the fall, and her muscle relaxant was changed to Robaxin for her chronic low back pain. Id.

Ms. Pogany contacted the clinic on July 20, 2015, and reported having fallen down some stairs, and contacted the clinic again later and reported being in excruciating pain and her counselor met her at the emergency room. AR1459-60. She later left the emergency room frustrated with the care and had a panic attack and drove herself home, even though she was not supposed to drive. Id.

Ms. Pogany saw Dr. Schurrer on August 13, 2015, and the notes indicate that disability papers had been initiated, and Dr. Schurrer stated, "...note that disability initiated which I am in total agreement with. The patient made huge strides in attempting to control her back issues but ongoing work only aggravates and this along with her psychiatric issues only compound her problem." AR1159.

Ms. Pogany saw Dr. Schurrer on August 17, 2015, to follow-up on emergency room treatment after another fall and she was bruised all over on her right leg. AR1146. On examination, Ms. Pogany had diffuse tenderness, but no significant swelling of her right leg and her hip, knee and ankle range of motion were normal. AR1150. Dr. Schurrer noted her disability process was in motion and stated, "…which I again support mainly from a mental health basis and her inability to comply with therapy while in the workforce." Id.

Ms. Pogany saw Dr. Schurrer on August 28, 2015, with increased pain and anxiety despite medications. AR1136. On examination, her back was tender with no deformity, her straight leg raises were negative, and her motor and sensory function were intact in the legs. AR1141. Dr. Schurrer gave her Depo-Medrol and Toradol, added Valproic acid, and considered adding Risperdal, and discussing Ms. Pogany with her counselor (Kelli) they felt Ms. Pogany was most likely bipolar and urgently needs to see psychiatry. Id.

Ms. Pogany saw Dr. Schurrer on September 15, 2015, for ongoing symptoms and examination revealed discomfort with movement, back tenderness and limited straight leg raise at 70-89 degrees. AR1128. Ms. Pogany's hip, knee, and ankle range of motion were intact, as were her motor and sensory functions. Id. Ms. Pogany said that she was sleeping better with her current medications and waking up refreshed and she described her overall mood as "fair." AR1123. Dr. Schurrer again emphasized the strong emotional/psychiatric ties to her physical state and stated, "Working more is only going to aggravate her situation with increased pain relief and more

anxiety with her uncertainty. She is in need of long term counseling/psychiatric care and limited work to attempt to move forward." AR1128. Dr. Schurrer also noted her medications were limited due to cost constraints. Id. She saw Dr. Schurrer again on September 23, 2015, with continued symptoms and straight leg raise was now limited at 70 degrees, her hip, knee, and ankle range of motion were intact, and an injection was given in her hip. AR1121.

Ms. Pogany saw Dr. Schurrer on October 9, 2015, and reported ongoing sciatica pain and was taking sertraline and Prazosin for nightmares, which she said was "good." AR1105. She continued taking hydrocodone for pain and was unable to get back to the pain clinic due to insurance limitations. AR1110.

Ms. Pogany saw Dr. Schurrer on December 4, 2015, with ongoing back pain and was working 20-25 hours per week. AR1035. She was taking hydrocodone max of four per day and Tramadol on better days, and described the pain feeling like a knife in her lower SI area. Id. On examination, her back range of motion was intact. AR1040. Ms. Pogany was given a Toradol injection and her hydrocodone was refilled. Id. Ms. Pogany was seen again on December 7, 2015, and given a trigger point injection for pain. AR1030. She said that the Toradol injection helped, and that she had been taking the hydrocodone max of four pills and she felt she was not "getting anywhere." AR1025. On examination, her straight leg raises were negative, her reflexes, motor and sensory functions were intact, and her hip, knee and ankle range of motion were intact. AR1030.

Ms. Pogany saw Dr. Schurrer on February 9, 2016, with ongoing back pain and had fallen while walking her dog, and was given Depo-Medrol and Toradol injections.  AR968, 973.

Ms. Pogany saw Dr. Schurrer on March 7, 2016, and had fallen and cut her leg with a knife, and she ultimately confessed that she had taken oxycodone with her Ativan and that had caused her fall with the knife, and said she cannot handle Oxy, the doctors and hospital need to know she should never get Oxy again.  AR937-38.

Ms. Pogany contacted the clinic on March 14, 2016, and reported needing someone to talk because she was having a hard time, she had been written up for work absences and felt she would be fired.  AR986.

Ms. Pogany contacted the clinic on March 23, 2016, and reported having a rough day and was unsure whether she could complete her work shift.  Id.

Ms. Pogany presented at the clinic on March 28, 2016, for medication management of her lorazepam and hydrocodone and reported her pain and 6/10 and described things she did for her sciatic pain including ice/heat alterations and stretching exercises.  AR985.  Her affect was bright and cheerful.  Id.  Her hydrocodone was refilled for only one week because she could not afford more.  Id.  On March 30, 2016, Ms. Pogany was contacted to cancel her counseling appointment due to a conflict and she reported low energy, and a difficult day with pain and depression.  AR984.

Ms. Pogany contacted the clinic on April 4, 2016, and reported ongoing pain and more burning and gabapentin was prescribed.  Id.

Ms. Pogany contacted the clinic on April 6, 2016, and reported having increased stress due to being fired from her job due to excessive absences caused by her mental and physical health.  AR983.

Ms. Pogany contacted the clinic on April 19, 2016, and reported that when taking Wellbutrin her anxiety was "through the roof" and she had been on Cymbalta before and did well with that.  AR980.  Her sertraline was discontinued and citalopram prescribed.  Id.

Ms. Pogany contacted the clinic on April 27, 2016, and reported increased depression related to her lack of employment.  AR979.

Ms. Pogany saw Dr. Schurrer on August 1, 2016, to follow-up on a cut on her foot, and also reported her sciatica acting up a bit, and was very stressed and getting poor rest.  AR1701.  Ms. Pogany said that her stress was due to her disability denial.  Id.  Examination revealed tenderness in the neck with no deformity or limitation of range of motion, diffuse tenderness in the back with no deformity, tenderness in the chest, extremities revealed multiple fibromyalgia trigger points, and her assessment included chronic pain syndrome, and Dr. Schurrer stated again that Ms. Pogany was not able to physically and emotionally work full-time.  AR1706-07.

Ms. Pogany saw Dr. Schurrer on September 13, 2016, with ongoing back pain and blood in her urine, and reported left flank pain radiating around front.  AR1670.  Dr. Schurrer suspected renal colic and stone and wanted a CT scan but it was deferred because of insurance.  AR1675.

Ms. Pogany contacted the clinic on September 19, 2016, to cancel her appointment because she had no transportation and also reported that she had no money for prescriptions. AR1751. She described her symptoms as "OK," she said the bleeding in her rectum had stopped for the most part, and her flank pain was now intermittent. Id.

Ms. Pogany contacted the clinic on January 17, 2017, and asked about community counseling availability that would accommodate her lack of insurance. AR1743.

Ms. Pogany saw Dr. Schurrer on February 21, 2017, for left leg pain and received Depo-Medrol and Toradol injections. AR1645.

Ms. Pogany saw Dr. Schurrer on February 22, 2017, with low back pain and left leg pain and had cut back on most of her medications due to financial constraints, and had run out of lorazepam. AR1638. She said she had borrowed some gabapentin from a friend who had quit the medication. Id. She reported her pain is worse if on her feet or sitting too long, and cannot lie on her back. Id. Ms. Pogany said that she received some relief from her Toradol and Depo-Medrol shots the day before. Id. Examination revealed back tenderness and positive straight leg raise at about 70 degrees. AR1643. Ms. Pogany was in no apparent distress and her motor and sensory function were intact. Id. Dr. Schurrer noted her narcotic use was very minimal and he was concerned about her dropping meds with her psychiatric and chronic pain history, and also noted that a generalized exam and labs had also been put off due to financial constraints. Id. Hydrocodone was prescribed. Id. When

Ms. Pogany was seen on March 13, 2017, she was given a trigger point injection due to persistent and escalating pain. AR1632. On examination, her hip, knee and ankle range of motion were intact, as were her motor and sensory function. Id.

Ms. Pogany's care was transferred to Scott Hiltunen, MD, who she saw on August 7, 2017, to establish care and for foot pain. AR1597. Ms. Pogany told Dr. Hiltunen that she had some pain in her left foot and was "feeling pretty good now." Id.

Ms. Pogany saw Dr. Hiltunen on August 15, 2017, with left lower leg pain centered around the knee with swelling. AR1590. Examination revealed left leg joint effusion in the knee, edema in the leg below the knee, no redness or palpable cords, tenderness in the knee, and some crepitus. AR1595. Ms. Pogany's vascular ultrasound was negative for any deep vein thrombosis. AR1596. She was referred to Dr. Adler and Dr. Hiltunen stated, "I suspect she will need a knee replacement at some point." Id.

Ms. Pogany was scheduled with Dr. Adler at Orthopedic Institute and was notified that she would have to make a payment up front since she had no insurance, and Ms. Pogany said she would check with the county to see if she could get assistance. AR1731.

Ms. Pogany saw Dr. Hiltunen on September 22, 2017, for her annual exam, and it was noted that she had arthritis of multiple joints, specifically the left knee, sciatic-like back pain with radiation from her buttocks to her left foot exacerbated by sitting for long periods, depression, anxiety and had a couple of

recent falls. AR1582. Both falls were related to her left knee giving out, and Ms. Pogany was aware she need surgical intervention but finances were an issue. Id. Ms. Pogany reported her depression and anxiety were fairly well controlled with her current medication regimen. Id. Examination revealed a swollen left knee and an inability to extend it fully. AR1588.

Ms. Pogany was non-tender to palpation of the knee joints, she exhibited no lower extremity edema, her movement was intact in all extremities, and her sensation was normal in all extremities. Id. The examination neurological details noted a limping gait favoring the left lower extremity. Id. Her mood and affect were normal. Id. She was continued on hydrocodone, but due to drowsiness she was to take one pill less and use Tramadol earlier in the pre-noon time. AR1589. Ms. Pogany told Dr. Hiltunen that she wanted to hold off on orthopedic treatment on her knee. Id. Dr. Hiltunen assessed that her anxiety and depression seemed fairly well controlled. Id.

Dr. Hiltunen completed a physical medical source statement on November 7, 2017, regarding Ms. Pogany's limitations if she were to attempt full-time sustained work and stated she would be limited to less than two hours standing or walking per 8-hour workday, and less than six hours sitting per 8-hour workday. AR1772. Dr. Hiltunen stated she was limited in her ability to push and pull with her lower extremity and said he doubted she could do it at all. Her knee and her back would limit pushing and pulling to rarely. AR1773. Dr. Hiltunen stated Ms. Pogany was limited to rarely or never climbing, balancing, stooping, kneeling or crouching due to her knee

25

degenerations and those activities would only be recommended for ADLs, stating, "There's no chance she could do any of these even at rare frequency." Id.  Dr. Hiltunen also limited Ms. Pogany to only frequent reaching, handling and fingering.  Id.

Dr. Hiltunen completed a mental medical source statement on November 7, 2017, regarding Ms. Pogany's mental limitations if she were to attempt full-time sustained work and stated she had moderate limitations to her ability to understand, remember, and carry out detailed instructions, maintain concentration for extended periods, complete a normal workday and workweek without psychological interruptions and to perform at a consistent pace, and to handle changes in work setting.  AR1777-78.

### 2. Avera McGreevy Clinic Records:  Counseling Records

Ms. Pogany saw Kelli Rockafellow, MSW, CSW-PIP, on October 22, 2014, to initiate the coordinated care program to obtain counseling.  AR1446.  Her GAD-7 Anxiety Severity score was 18, in the severe anxiety range and her PHQ-9 score was 21 indicating that treatment for depression was warranted. AR1444-46.

Over approximately the next two years Ms. Pogany saw Ms. Rockafellow for 89 counseling sessions.  AR881-1499, 1576-1770.  The counseling notes described varying symptoms with attention and concentration from fair at times to good other times and psychomotor was listed as fidgety or agitated. Id.  Ms. Pogany's depression symptoms included feelings of hopelessness, low self-esteem, anxious or dysphoric mood at times, other times happy or elevated

mood, and restricted affect at times and other times bright affect.  Id.  Her anxiety included difficulty concentrating with constant worry and persistent thoughts, and her PTSD caused sleep issues with her symptoms varying from moderate to severe.  Id.  The counseling sessions focused on a variety of issues including sleep issues, chronic pain issues, relationship problems, assistance programs, including FMLA, medication issues and coping skills.  Id.

The counseling notes for November 12, 2014, stated that Ms. Pogany had been approved for temporary disability from work until November 24.  AR1424.  At that appointment, she was fully oriented, her memory was grossly intact, her language was good, her attention, concentration and fund of knowledge were fair, her mood was euthymic, her affect was congruent, and her psychomotor activity was fidgeting.  AR1423.  In addition, Ms. Pogany's insight and judgment were fair and she exhibited no abnormal thoughts.  R1424.  Her depression screening was negative.  Id.  The counseling note from December 30, 2014, stated that her leave from work had been extended to February 1st.  AR1353.  On examination, her memory was grossly intact, her attention, concentration, language, and fund of knowledge were good, her affect was bright, her mood was happy and elevated, she had no abnormal thoughts, and her thought content was logical and coherent.  AR1352.  Ms. Pogany said that she felt things were going well.  AR1353.

The counseling notes for January 27, 2015, document that Ms. Pogany reported being in a state of panic and was unable to relax.  AR1317.

Ms. Pogany left her appointment but called her counselor multiple times that day, and her counselor suggested that Ms. Pogany go to Behavioral Health for a psychological examination, but Ms. Pogany stated she was not suicidal. AR1318.

The counseling notes for February 11, 2015, state that Ms. Pogany had gone back to work and reported it went "ok" but she had increased back pain. AR1306. On examination, Ms. Pogany's memory was grossly intact, her attention, concentration, language, and fund of knowledge were good, her affect was bright, her mood was elevated, her insight and judgment were fair, her thought content was logical and coherent, her psychomotor activity was fidgeting, and her speech was mildly pressured and hyperverbal. AR1305.

The counseling notes for March 10, 2015, state Ms. Pogany was concerned about her next psychiatric appointment because she did not have the co-pay so would have to cancel her appointment, but felt she needed her psychiatric medication dosage increased. AR1272. On examination, Ms. Pogany's memory was grossly intact, her language was good, her attention, concentration, fund of knowledge, insight and judgment were fair, and her thought contact was logical and coherent. AR1271.

The counseling notes for April 3, 2015, stated Ms. Pogany had resigned from her job at Hy-Vee because if she had stayed she would have gone crazy. AR1268. Ms. Pogany said that she was going to start looking for a new job. Id. On examination, her memory was grossly intact, her attention, concentration, and language were good, her fund of knowledge, insight and judgment were

28

fair, her affect was bright, her mood was elevated and her psychomotor activity was restless and fidgeting.  AR1267.

The counseling notes for April 6, 2015, stated Ms. Pogany was losing her insurance because she could not afford COBRA payments.  AR1258. Ms. Pogany reported that she was doing "ok" and was still looking for a new job.  Id.  Her memory was grossly intact, her attention, concentration, language and fund of knowledge were good, her insight and judgment were fair, her mood was bright, her affect was elevated and her psychomotor activity was restless and fidgeting.  AR1257.

The counseling notes for June 15, 2015, stated Ms. Pogany was working at two part-time jobs which resulted in working some days 12-15 hours per day.  AR1199.  Her counselor discussed with her the potential ramifications this could have, and Ms. Pogany had received Tramadol for her increased back pain.  Id.  Her memory was grossly intact, her attention, concentration, and language were good, her insight and judgment were fair, her affect was bright, her mood was happy, and her psychomotor activity was normal.  AR1198.

At Ms. Pogany's next counseling session on June 23, 2015, she appeared agitated and reported that she was killing herself working two jobs.  AR1196. Ms. Pogany reported increased back pain and anxiety and problems sleeping. Id.  Her attention, concentration, insight and judgment were fair.  Id.  By July 2, 2015, Ms. Pogany reported she realized she cannot physically or mentally work both part-time jobs the same day and was reducing her hours.  AR1194. Ms. Pogany said she had established a plan for getting her bills paid that

month, which had reduced her stress.  Id.  She said she had stopped her antidepressant 30 days ago.  Id.  On examination, her memory was grossly intact, her attention, concentration, and language were good, her insight and judgment were fair, her psychomotor activity was normal, and her mood and affect were neutral.  AR1193.

The counseling notes for July 23, 2015, stated Ms. Pogany was working seven days per week but shorter shifts and she felt she could handle that. AR1174.  She said she was able to sleep better the night before, which had helped her mood.  Id.  Her memory was grossly intact, her attention, concentration and language were good, her insight and judgment were fair, her psychomotor activity was normal, and her mood and affect were neutral. AR1173.

The counseling notes for August 31, 2015, stated Ms. Pogany expressed feelings of fight or flight and was not sure how much more she could take. AR1134.  She reported her anxiety medication was not working; her back pain was increased, and was still working but struggling to do so.  Id.  Her memory was grossly intact, her attention, concentration, insight and judgment were fair, she exhibited no abnormal thoughts, her psychomotor activity was fidgeting, and her rate of thoughts was increased and speech hyperverbal. AR1133.

The counseling notes of October 5, 2015, stated Ms. Pogany reported she had started having suicidal thoughts and her son had taken her to Avera Behavioral Health.  AR1112.  Ms. Pogany explained that her increased stress

was due to financial concerns and the fact that she had "not yet heard from anyone at disability." Id.

The counseling notes for November 3, 2015, stated Ms. Pogany had not been taking some of her medications because she could not afford them. AR1098. Her memory was grossly intact, she had no abnormal thoughts, and her attention, concentration, language, insight, judgment and fund of knowledge were fair, her mood was anxious, worried and irritable, and her psychomotor activity was fidgeting. AR1097. Ms. Pogany reported that she felt better upon leaving her counseling appointment. AR1098.

The counseling notes for November 30, 2015, state Ms. Pogany reported increased back pain, depression, and her anxiety had increased when she was unable to work her shift the day before due to increased back pain. AR1087. Ms. Pogany said that her medications were still working for her. Id. On examination, her memory was grossly intact, her attention, concentration, insight and judgment were fair, her psychomotor activity was normal, she had no abnormal thoughts, her mood was worried and affect was downcast. AR1086. On December 7, 2015, Ms. Pogany reported her back pain had become intolerable, and she received an injection and her counselor suggested she reduce her four hour work shifts. AR1033. Ms. Pogany's attention, concentration, insight, and judgment were fair, her memory was grossly intact, her psychomotor activity was normal, her thought content was logical and coherent, and her affect was tearful and downcast and her mood was anxious. AR1032.

The counseling notes for March 3, 2016, stated Ms. Pogany was having a good day, but had left work twice in the last week due to chronic pain and increased PTSD symptoms. AR940. Ms. Pogany explained that the last couple of days had been better and she felt her depression was "in a good place today." Id. Ms. Pogany and her counselor "completed the appeal application for Social Security Disability." Id. On examination, Ms. Pogany's attention, concentration, insight and judgment were good, her affect was neutral, her mood was euthymic, her affect neutral, and her psychomotor activity was fidgeting. AR939.

On March 14, 2016, she reported missing another work shift due to a panic attack. AR925. Ms. Pogany also reported that although she had no plans for self-harm she did have thoughts that she would be better off dead. Id. Ms. Pogany explained that she currently denied feeling that she would be better off dead. She also said that she was going to start looking for another job, just not today because she was physically and mentally exhausted. Id. Her attention, concentration, insight, and judgment were fair, her thought content was logical and coherent, her affect downcast, mood anxious, and her psychomotor activity was fidgeting. AR924.

Ms. Pogany reported again on April 4, 2016, that she had missed work the last two days due to pain and mental health issues, and felt she may be fired. AR917. Her psychomotor activity was normal, her thoughts were logical and coherent, her memory was grossly intact, and her appearance, attention

and concentration were fair.  AR916.  The counseling note for April 11, 2016, indicates

Ms. Pogany was looking for work that she could do despite her pain and mental health problems.  AR907.  Ms. Pogany's mood was euthymic, her affect was neutral, her psychomotor activity and articulation were normal, her memory was grossly intact and her eye contact was fair.  AR905.

The counseling notes for April 28, 2016, state that Ms. Pogany had previously been observed to have psychomotor activity consistently restless and fidgeting, but that day appeared sullen and lethargic, and she continued to be out of work. AR891.  Examination that day revealed her psychomotor activity was normal and her attention, concentration, insight and judgment were fair. AR890.

The counseling notes for May 9, 2016, stated Ms. Pogany reported increased irritability and anger in regard to her healthcare team, and also reported swelling in her left knee, which Ms. Rockafellow observed.  AR885. Ms. Rockafellow asked Ms. Pogany if she would like assistance scheduling an appointment with her primary care provider, as Ms. Rockafellow was not medically trained.  Id. Ms. Pogany declined because she needed to "work though some of her feelings prior to seeking care." AR885. Ms. Pogany requested ending the session early due to the way she felt.  Id.  Her mental exam revealed fair fund of knowledge, downcast affect, irritable mood, and fair judgment/insight.  AR884.

The counseling notes for August 5, 2016, stated Ms. Pogany was not taking her medications due to financial reasons and attempts by her counselor to find options had been unsuccessful. AR1696. Ms. Pogany appeared tearful and reported her pain continued to increase which then affects her depression. Id. Her psychomotor activity was normal, her memory was grossly intact, her attention, concentration, insight and judgment were fair, her affect was downcast, and her mood was anxious, dysphoric and worried. AR1695.

On August 10, 2016, when seen Ms. Pogany was described as anxious and overwhelmed and was hyperverbal and fidgety while describing her week. AR1693. Ms. Pogany said that her anxiety was high due to her financial concerns. Id. She said her nightmares had lessened in frequency and her sciatica was better that day. Id. She said things were "ok." Id. On examination, her memory was grossly intact, her language was good, her attention, concentration, fund of knowledge, insight and judgment were fair, her thought contact was logical and coherent, her mood anxious and worried, and her psychomotor activity was fidgeting. AR1692.

On August 9, 2016, Ms. Kelli Willis, MSW, CSW-PIP, QMHP, Ms. Pogany's counselor wrote a letter to SSA regarding her treatment of Ms. Pogany. She stated she had provided counseling services to Ms. Pogany since October 19, 2014, for depression, anxiety, and PTSD. AR1539. She said that she had been assisting Ms. Pogany as she worked toward obtaining disability benefits for ongoing physical and mental health issues. Id.

Ms. Willis stated she did not believe Ms. Pogany was able to maintain a full-time job, and attempts to do so had resulted in detrimental results and lost employment, and due to the uncertainty of her mental health it was not possible to determine when, and if she may be able to return to full time work. Id. Ms. Willis noted that although Ms. Pogany could generally complete activities of daily living such as personal hygiene and light housekeeping, they were greatly affected by her mental health and were not completed on a daily basis depending on her emotional status and level of pain. Id. Ms. Willis requested that Ms. Pogany's denial of disability benefits be reconsidered due to the effects her mental and physical health have on her ability to maintain employment. Id.

The counseling notes for September 14, 2016, stated Ms. Pogany's counselor was leaving and they were unsure when a replacement would be hired. AR1668. Ms. Pogany's counselor discussed options for transition and encouraged Ms. Pogany to schedule an appointment with Southeastern Behavioral Health so that she did not lose the ground she had achieved in managing her mental health symptoms. Id.

### 3. AMG Psychiatric Associates Records

Ms. Pogany was seen by psychiatrist Michael Bergan, M.D., on December 1, 2014, for depression and anxiety. AR549. Ms. Pogany reported anxiety symptoms including frequent worrying, feeling on edge, restless, keyed up, irritability, racing thoughts on occasion making concentration and sleeping hard, tension in her shoulder and neck area, and having difficulty dealing with

things at work since her husband committed suicide. AR549. Ms. Pogany said she had been diagnosed with PTSD after finding her ex-husband hanging in the garage and reported nightmares, flashbacks, avoiding the street it happened on and people, marked decreased interest in life, outbursts of anger, hypervigilance, and being easily startled. AR549-50. Ms. Pogany also reported panic attacks feeling in "flight or fight mode," inability to settle down or focus, chest tightness, troubled and rapid breathing, shakiness, and sometimes nausea and vomiting. AR550. Ms. Pogany rated her current mood at 5/10 and 6/10 on average over the last month. AR549. She sometimes enjoyed reading and watching movies and she denied suicidal thoughts. Id.

Examination revealed ambivalent, anxious, worried mood, very mild compulsive thoughts, good to fair insight and good judgment. AR556. Ms. Pogany was cooperative, her eye contact was good, her speech was clear and non-pressured, her psychomotor activity was normal, her thoughts were coherent, logical and goal-directed, her memory was grossly intact, and her intelligence and fund of knowledge were average. Id. Her gait and station were steady and she exhibited no abnormal movements. Id. Dr. Bergen's assessments were PTSD, anxiety, depression, panic disorder, borderline personality traits, and opiate induced mood disorder. AR551. He prescribed sertraline, continued mirtazapine and Wellbutrin and wanted her to minimize lorazepam usage because it makes it difficult to process emotions in PTSD. Id. Dr. Bergen encouraged Ms. Pogany to continue therapy with Ms. Rockafellow. Id.

Ms. Pogany was seen by Dr. Bergen on December 22, 2014, and reported increased symptoms and sleep problems. AR542. Dr. Bergen increased her sertraline dosage, stopped her mirtazapine, and started doxepin to help with Ms. Pogany's sleep issues. Id. Ms. Pogany's eye contact was good, she was cooperative, her psychomotor activity was normal, her thought processes were coherent, logical and goal directed, her memory was grossly intact, her insight and judgment were fair, and her mood was irritable, anxious and worried. AR547. Her gait and station were steady and she exhibited no abnormal movements. Id.

### 4. Sanford Health System Records

Ms. Pogany was seen at the 69th and Minnesota Clinic on April 20, 2014, due to back, neck and knee pain following a fall at work. AR586. She reported back pain with radiation into both buttocks. AR587. Examination revealed slow movement from sitting to standing, moderately decreased back range of motion with pain, moderately decreased neck range of motion with no pain or limitation with neck extension, pain with back palpation, and negative SLR bilaterally. AR587. Inspection of Ms. Pogany's neck and back were normal, she had no weakness in her lower extremities, and circulation and sensation were fully intact in her lower extremities. Id. An x-ray of her thoracolumbar spine revealed some degenerative joint disease, but no acute changes. Id.

Ms. Pogany was seen again at the clinic on May 25, 2014, for low back pain after lifting her dog. AR586. Examination revealed pain with lateral tilt

and rotation, negative SLR, and antalgic gait.  Id.  Ms. Pogany's neck range of motion was normal, as was an examination of her hips.  Id.  She was very pleasant and animated with a normal mood and affect.  Id.  Hydrocodone was prescribed along with Flexeril.  Id.

She was seen again at the clinic on June 6, 2014, with lower left back pain and chills.  AR584.  Ms. Pogany said that her lower back pain developed "after unloading, pulling and unloading a frozen order at work" the day before. Id. On examination, her neck range of motion was normal, her straight leg raises were negative, her reflexes, muscle tone and coordination were normal, and her back exam revealed tenderness and she had an antalgic gait.  AR584-85.  Ms. Pogany's mood and affect were also normal.  AR586.

Ms. Pogany was seen at the Orthopedic Clinic on June 16, 2014, for low back pain. AR582.  She reported pain 7/10 burning, ache, sharp and shooting down the left leg.  Id. Examination revealed tenderness on palpation and positive SLR at 40 degrees on left.  AR583.  Ms. Pogany had no gait deviations and her lumbar range of motion was normal throughout.  Id.  Lumbar x-rays obtained on April 20, 2014, revealed moderate degenerative changes with moderate to marked disk space narrowing at L5-S1.  AR583, 649.  Prednisone was prescribed along with the hydrocodone and Flexeril.  AR584.

Ms. Pogany was seen at the 69th and Minnesota Clinic on August 17, 2014, due to left hip pain following a fall while she was walking her 50-pound dog. AR581.  She exhibited decreased lumbar range of motion, tenderness, and pain, but no swelling or deformity.  Id.  She had equal sensation to touch

in both lower extremities and equal strength on resisted flexion and extension of both knees.  Id.  Her neurological examination revealed normal strength and no sensory deficit.  Id.  Her mood, affect, behavior and judgment were normal. AR582.

Ms. Pogany was seen at Sanford Hospital on May 27, 2015, due to left knee and ankle pain following a fall when she tripped over her dog.  AR575. Examination revealed swelling, effusion and bony tenderness of the left knee and decreased range of motion, swelling and ecchymosis of the left ankle. AR576.  Ms. Pogany's left knee examination also revealed normal range of motion and alignment with no deformity.  Id.  She had no deformity of her left ankle.  AR576.  Further, Ms. Pogany had no cranial nerve deficit and her coordination was normal.  Id. Her mood, affect, behavior, judgment and thought content were also normal.  Id. Ms. Pogany's left ankle and knee x-rays showed no fracture.  Id.

Ms. Pogany was seen at Sanford Hospital on July 31, 2015, for chest heaviness and pressure and two episodes of fainting. AR565-66.  The first episode occurred at home and the second later at work, and during the second episode she "woke up" with the ambulance crew.  AR566.  Ms. Pogany's cardiovascular and pulmonary/chest examinations were normal.  AR567.  Her strength, muscle tone, coordination and neck and musculoskeletal range of motion were also normal.  Id. She was not disoriented and she had no cranial nerve or sensory deficit.  Id.  Her mood, affect, behavior, judgment and thought

content were normal.  Id.  Her discharge diagnoses were syncope secondary to dehydration, chest pain non-cardiogenic and anxiety.  AR573.

Ms. Pogany was seen at the 26th and Sycamore Clinic on August 14, 2015, due to ankle pain following a fall while walking her dog.  AR565.  She was able to bear weight directly after the injury and she specifically denied any head, neck or back pain.  Id.  Ms. Pogany's entire spine was non-tender with full range of motion and no pain.  Id.  An x-ray showed no fracture of the foot or ankle.  Id.

Ms. Pogany was seen at Sanford Hospital on September 25, 2015, and reported she had just been at the Avera ER for a panic attack and chest pain, and they treated her panic attack but ignored her chest pain.  AR561.  She reported that with her chest pain she also had shortness of breath, stress/anxiety, and a panic attack.  Id.  On examination, Ms. Pogany's chest and heart examinations were normal.  AR562.  Her back was non-tender with full range of motion and no pain or tenderness.  Id.  She had no exacerbation of pain with range of motion or use of her arms.  Id.  Her muscle tone, gait, stations, and motor and sensory functions were normal and she exhibited 5/5 strength.  Id.  Ms. Pogany's diagnosis was chest pain, atypical and admission was offered but she refused.  AR563.

### 5.     Midwest Pain & Rehabilitation Clinic Records

Ms. Pogany was seen at Midwest Pain & Rehabilitation on March 10, 2015, for low back pain.  AR558. She said that she was "working full duty" and had new insurance.   On examination, she was alert, oriented and cooperative

and did not exhibit pain behavior, her cognition and mentation were intact, she was emotionally pleasant and she walked independently without an assistive device.  Id.  Her assessments included chronic low back pain, sacroiliac strain, myofascial syndrome, and chronic opioid therapy.  Id.

Ms. Pogany was seen again on March 24, 2015, and reported that oxycodone was helping control her back pain, and she was also using ice, Tens unit, and exercise.  AR559.  The record stated she was working full time with good tolerance, and she exhibited no drug-seeking behavior.  Id. Ms. Pogany reported that she had been walking her dog.  Id.  Her examination again revealed that she was alert oriented and cooperative, she did not exhibit pain behavior, her cognition and mentation were intact, she was emotionally pleasant, and she walked independently without an assistive device.  Id.

### 6.    Avera McKennan and Behavioral Health Hospital Records

On August 6, 2014, Ms. Pogany was seen at the Avera Pain Clinic for injections in her back due to low back pain, and the record noted that her MRI showed a disk protrusion at L4-5 extending into the L4-5 foramen resulting in stenosis and a facet cyst that projects into the left neural foramen at that level, and that she had also received physical therapy, which she said "perhaps helped a little bit."  AR793, 802.  Twenty-five minutes after her injection, Ms. Pogany reported 50% pain relief of her left leg.  AR794.  The record indicated that a lumbar MRI was obtained on June 27, 2014, but the MRI does not appear in the appeal record.  AR790.

Ms. Pogany was seen on September 10, 2014, for repeat injections in her back due to severe left-sided low back pain with radiation to the left knee. AR785.  Twenty-five minutes after the injections, Ms. Pogany reported 60-70% pain relief and she was doing much better overall.  AR786.  Scott Lockwood, M.D. noted that he could tell Ms. Pogany was doing much better by the way she moved out of her chair.  Id.  Dr. Lockwood felt that long-term Ms. Pogany was headed toward a surgical consultation.  Id.

Ms. Pogany was seen in the emergency room on October 12, 2014, for chronic back pain following an acute injury while bending over to pick up her phone.  AR779.  On examination, Ms. Pogany was in no acute distress, she was able to plantar and dorsiflex without any difficulties, and she had full function of extensor hallucis longus.  AR780.  She was discharged in stable condition. Id.  She was seen again at the emergency room the next day and followed up with her back surgeon the same day and received Toradol and IM steroid injections. She reported she felt somewhat better after receiving treatment the day before and was not having a worsening of her pain after her initial improvement.  AR775.  Her extremities were non-tender and she had equal strength in her bilateral lower extremities.  AR776.

Ms. Pogany was seen on November 24, 2014, for L4-5 facet injections. The record stated Ms. Pogany's MRI showed extensive degenerative disk disease with facet arthropathy at L4-5 and a facet cyst at L3-4.  AR771.  Twenty-five minutes after the injections, Ms. Pogany reported 90% pain relief and she said

her left leg pain had resolved. AR771. She was able to extend her spine with very little discomfort. Id.

Ms. Pogany was admitted to Avera McKennan Hospital on December 4, 2014, for intractable pain following a medial branch radiofrequency, rhizotomy, performed for L4-5 facet joint pain. AR506, 519, 522. She was described as having a history of chronic back pain treated with facet injections. AR506.

Ms. Pogany was seen at Avera Behavioral Health on January 26, 2015, for a psychological assessment upon referral from her counselor and Dr. Schurrer for opioid use disorder, depression, anxiety, and PTSD. AR744. Outpatient treatment was recommended for substance abuse disorder. AR745, 750. Ms. Pogany maintained eye contact, she was cooperative and oriented x3, and her mood and thoughts were within normal limits. AR744.

Ms. Pogany was seen at the emergency room on April 2, 2015, for increasing back pain following an incident that occurred while walking her dog. AR736. She was alert and oriented with normal strength and sensation in all four extremities, and significant movement of her right lower extremity does increase her pain. AR737. The radiologist stated the x-rays revealed mild to moderate lumbar spondylosis greatest at L5-S1, and facet arthropathy L3-4 through L5-S1. AR740. Matthew Nipe, M.D., assessed that the x-ray showed "some degenerative change but no other significant findings." AR737.

Ms. Pogany returned to the emergency room again on April 3, 2015, for chronic left-sided back pain. AR732-33. Her extremities were grossly atraumatic and her neurologic examination revealed good strength in all

extremities and no mid-line tenderness over the spine, and she appeared to be in moderate pain, and was tearful and anxious. AR733.

Ms. Pogany was seen at the emergency room on May 21, 2015, for nausea and vomiting following stopping of her narcotic pain medications 3.5 days earlier. AR727. She said she had "been having a couple alcoholic drinks to help with withdrawal symptoms." Id. Her diagnosis was opiate withdrawal. AR728. The emergency room physician advised Ms. Pogany to discontinue alcohol use and Advil. Id.

Ms. Pogany was seen at the emergency room on July 30, 2015, for acute on chronic low back pain following a fall on her stairs. AR716. She said she was late for work and tripped and fell while running down her stairs. Id. An examination revealed some minimal left CVA tenderness, but "otherwise no significant lower back pain." AR719. Ms. Pogany exhibited equal strength, intact sensation, and normal range of motion in her bilateral lower extremities. AR720. The emergency room staff offered to make an appointment with Ms. Pogany's primary care provider for further evaluation, including possible imaging and physical therapy, but she declined. AR720-21.

Ms. Pogany was seen at the emergency room on August 14, 2015, for chronic pain and chronic anxiety. AR816. She said she had been hyperventilating to the point she thought she would pass out. Id.

Ms. Pogany was seen at the emergency room on September 25, 2015, for chest pain and anxiety. AR808. She reported that she felt her chest pain was due to her panic attacks and she thought she was going to die. Id. The exam

record stated Ms. Pogany had an "extensive history of emergency department visits secondary to her anxiety." AR808. On examination, she moved all 4 extremities without difficulty, she had no focal or neurological deficits, she denied suicidal thoughts or plans, she was very anxious, thrashing around on the bed and hyperventilating, her speech was pressured, and she reported numbness in both hands. AR811. Ms. Pogany did not want to be admitted to the hospital and she declined offers to enroll her in a partial outpatient program at behavioral health. AR812. She was discharged in stable condition. Id.

Ms. Pogany was admitted to Avera Behavioral Health on a voluntary basis on September 27, 2015, to prevent self-harm. AR659. Ms. Pogany reported experiencing flashbacks of her dead husband who told her to hang herself for causing his suicide, and stated she was going to cut her wrist. AR660, 663. Her examination on admission revealed no homicidal or suicidal ideations, logical and goal directed thought processes, no loosing of associations or tangential or circumstantial thoughts, and her mood was worried and affect blunted. AR661. Ms. Pogany's diagnoses were PTSD, borderline personality disorder, depression and panic disorder. AR659. She received counseling and prazosin was prescribed for her nightmares, as well as Zoloft, Ativan and Vistaril, and Klonopin was continued. AR661. She was discharged on September 29, 2015. Id.

Ms. Pogany was seen at the emergency room on January 17, 2016, for back/hip pain extending into her leg following a fall on the ice. AR700, 704.

45

She was in no acute distress, she had some minor reproducible tenderness in her low back, and her motor strength was grossly intact to both lower extremities.  AR701.

Ms. Pogany was seen at the emergency room on September 16, 2016, for left flank pain.  AR1546.  A CT was obtained for renal stone protocol, but no obstruction was found.  AR1547-48.

Ms. Pogany presented at the emergency room via ambulance on March 6, 2017, following an episode of syncope at home.  AR1551.  Ms. Pogany reported a severe headache, nausea and vomiting.  Id.  During cranial nerve testing Ms. Pogany became unresponsive with spontaneous eye opening but without response to painful stimuli or other purposeful movements.  AR1556.  Her cranial nerves, gait and speech were normal, she moved all extremities normally, and she exhibited no motor weakness, sensory deficit or slurred speech.  Id. She was alert and oriented (except during the cranial nerve testing episode) and her affect was normal.  Id.  Ms. Pogany's musculoskeletal range of motion was also normal.  Id.  A brain CT was obtained but showed no acute abnormality.  AR1560.

Ms. Pogany was seen at the emergency room on August 15, 2017, for pain in her lower extremity.  AR1572.  The appeal record indicates only that a left leg venous duplex was obtained due to limb pain and swelling and no evidence of acute deep vein thrombosis was found.  AR1574.

### 7.    State Agency Assessments

The State agency physician consultant at the initial level on February 12, 2016, found that Ms. Pogany had a severe disorder of her back-discogenic and degenerative.  AR113.  The consultant found that Ms. Pogany was capable of light work with postural limitations of frequent stooping, kneeling, crouching, and crawling, frequent climbing of ramps and stairs, and never climbing ladders, ropes or scaffolds.  AR116.  The postural limitations were due to degenerative disc disease and subjective statements of back pain and the avoidance of ladders, ropes and scaffolds was due to narcotic use.  AR116-17. The State agency physician consultant at the reconsideration level on June 22, 2016, made the same findings.  AR146, 149-50.  The consultants at both levels stated that there was no medical or other opinion evidence in the file at the time of their assessments.  AR115, 149.

The State agency psychological consultant at the initial level on February 10, 2016, found that Ms. Pogany had medically determinable impairments of anxiety disorder, affective disorder, and personality disorder but none of them were severe, because they caused only mild functional impairments.  AR113-14.  The State agency expert at the reconsideration level made similar findings on June 27, 2016, except also finding non-severe substance addiction disorder. AR146.  The consultants at both levels stated that there was no medical or other opinion evidence in the file at the time of their assessments.  AR115, 149.

**D.    Testimony at ALJ Hearing**

**1.    Ms. Pogany's Testimony**

Ms. Pogany testified that she was on short-term disability from November 2014, through February 2015, because she was struggling with PTSD due to her husband's suicide.  AR49.  She said she had difficulty being around people and feeling closed-in, and she kept seeing "those pictures" in her head and could not go back to work due to that and her back issues.  AR50-51.  She explained she could not handle being on her feet all the time, bending, stooping and lifting.  AR52.

Ms. Pogany testified that she then tried part-time work at TJ Maxx but was fired due to absences caused by either her back or her mental health. AR50.  She said she worked only part-time, missed 12 days in approximately eight months, and had additional days when she would arrive late or leave early.  AR54-55.

Ms. Pogany testified that her ex-husband continued to reside with her when he hung himself in her garage, and she was the one to find him.  AR55-56.  She said she continued to have nightmares, and at work she could not handle being corrected by supervisors or co-workers and little things would eat at her until she made them into huge things.  AR56-58.

Ms. Pogany testified that when working she had trouble concentrating, focusing, remembering, and completing tasks, and would have panic attacks. AR60-61.  She said she had these difficulties at work from 25 to 50 percent of the time on bad days.  AR61.  She testified that at times she need to get away

48

from people at work and would go to the restroom, her car, or go walk around the gas station and was reprimanded for her absences.  AR62-63.  Ms. Pogany testified that she feels physically fidgety all the time.  AR63.

Ms. Pogany testified that she had been taking hydrocodone for her pain, but had been on it so long it was not really working and was taking gabapentin with the dosage recently increased and tramadol.  AR66.  She said the rhizotomy she had on her back was horrible and it only helped for probably a couple of months.  AR68.  Ms. Pogany testified that she continued to have burning and aching low back pain with sciatica on her left side with sharp shooting pains down her leg.  AR69.

Ms. Pogany testified that she had not been able to see her psychiatrist because she did not have insurance or money and no one wants to see her. AR67.

Ms. Pogany testified that x-rays showed her knee was "like bone on bone" and she needed a knee replacement but could not get one due to no insurance. AR67-68.

Ms. Pogany testified that she went grocery shopping once a month, and said "But a lot of times, if I get there, its just – you know, there's so many people so I'm just like, you know what, I don't really care what I get, I'm just throwing crap in my cart so I can get the hell out of here because these people are driving me nuts or this noise is killing me or I can't stand this, and I just – you know – I mean, I can get it because it's only once a month.  AR64.  She further testified when asked if she leaves her apartment that she has to – "I

have to go outside because my dog, I have to take my dog out....So that makes me go out." AR65. She also visited a friend that lived in her apartment complex. Id. She sometimes accompanied that friend on short errands to get out of the house. AR78.

Ms. Pogany testified that she did not experience any side effects from gabapentin or tramadol. AR71.

### 2. Vocational Expert Testimony

The VE testified that a person with a light exertion RFC who could occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds; occasionally stoop, kneel crouch and crawl; must avoid even moderate exposure to workplace hazards; and was restricted to simple, routine tasks and occasional and superficial contact with coworkers and the public would not be able to perform Ms. Pogany's past work but they could perform the occupations of garment sorter, DOT# 232.687-014, laundry worker, DOT# 361.687-014, and motel housekeeper, DOT# 323.687-014. AR82-83. The VE provided only national numbers of jobs for those occupations. AR82-83.

The VE testified that a person with a sedentary RFC who was also limited to occasional climbing of ramps and stairs, but never ladders, ropes or scaffolds; occasionally stooping, kneeling, crouching and crawling; must avoid even moderate exposure to workplace hazards; and was limited to performing only simple and routine tasks with only occasional and superficial contact with coworkers and the public would not be able to perform any of Ms. Pogany's past work. AR83-84.

The VE testified that an individual would be unemployable if they were off task for one hour of each workday or missed, was late, or left work early in any combination more than three times per month.  AR84-85.

**E.    Other Evidence**

A letter from The Hartford stated that Ms. Pogany received short-term disability benefits from November 6, 2014, through February 4, 2015.  AR342.

**F.    Disputed Facts**

The Appeals Council responded on March 20, 2018, to plaintiff's counsel's letter dated March 6, 2018, but never gave counsel access to the e-file.  Plaintiff's counsel wrote again to the Appeals Council on April 16, 2018 (see attached exhibit A), continuing to request access to Ms. Pogany's e-file, and the Appeals Council responded on May 15, 2018 (AR7), but again did not give counsel access to the e-file.  Plaintiff's counsel again wrote to the Appeals Council and requested access to the e-file for the third time on May 22, 2018 (see attached exhibit B), and no response was ever received until the Appeals Council denied Ms. Pogany's request for review on July 27, 2018, making the ALJ's decision the final decision of the Commissioner.  AR1.

## DISCUSSION

**A.    Standard of Review**

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less

than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d

852, 853 (8th Cir. 1998)(citations omitted).   The Commissioner's conclusions

of law are only persuasive, not binding, on the reviewing court.  Smith, 982

F.2d at 311.

## B.     The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment

must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy.

42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  If the determination that an applicant is disabled can definitively

be made at any step, evaluation under a subsequent step is unnecessary.

Bartlett v. Heckler, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as

follows:

> **Step One**:  Determine whether the applicant is presently engaged
> in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the
> applicant is engaged in substantial gainful activity, he is not
> disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

**C.    Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  <u>Mittlestedt</u>, 204 F.3d at 852; <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994); 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  <u>Brown v. Apfel</u>, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act."  <u>Walker v. Bowen</u>, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  <u>Stormo v. Barnhart</u> 377 F.3d 801, 806 (8th Cir. 2004).

**D.    The Parties' Positions**

Ms. Pogany asserts the Commissioner erred in two ways:  (1) The RFC formulation is not supported by substantial evidence; and (2) the Commissioner's Step 5 determination that there are occupations Ms. Pogany is capable of performing is not supported by substantial evidence.  The RFC assignment of error has three sub-parts: (1) the Commissioner failed to properly determine the limitations associated with Ms. Pogany's knee impairment; (2) The Commissioner failed to properly evaluate the opinions of Ms. Pogany's treating physicians; and (3) the Commissioner failed to properly determine the limitations posed by Ms. Pogany's mental impairments.  The

Commissioner asserts her decision is supported by substantial evidence in all respects and should be affirmed.

**E.    Analysis**

Ms. Pogany's arguments are addressed in turn below:

**1.    The Commissioner's Formulation of Ms. Pogany's RFC**

The ALJ determined Ms. Pogany is capable of less than the full range of light duty work. AR27.   Specifically, the ALJ found Ms. Pogany can lift/carry 20 pounds occasionally and 10 pounds frequently.  Id.  The ALJ further found Ms. Pogany can stand/walk for 6 hours out of an 8-hour workday and can sit for 6 hours out of an 8-hour workday.  Id.  The ALJ further found Ms. Pogany is limited to occasional climbing ramps/stairs, stooping, kneeling, crouching and crawling.  Id.  She must avoid even moderate exposure to workplace hazards and can never climb ladders/ropes or scaffolds. Id.  She is limited to performing simple, routine tasks and can tolerate only occasional and superficial contact with coworkers and the public.  Id.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."  Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), <u>abrogation on other grounds recognized in</u> <u>Higgins v. Apfel</u>, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  <u>Lauer</u>, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[5] <u>Lauer</u>, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u>  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special

---

[5] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule."). Ms. Pogany asserts the ALJ's formulation of her RFC was not supported by substantial evidence for a variety of reasons, discussed below.

### a. The Commissioner's determination of limitations imposed by Ms. Pogany's knee impairment

Ms. Pogany asserts the ALJ's formulation of the RFC is flawed because the ALJ failed to incorporate appropriate physical limitations related to her severe knee impairment. Specifically, Ms. Pogany cites the discrepancy between the ALJ's recognition that Ms. Pogany suffered from the severe impairment of tricompartmental arthritis[6] of the left knee and its failure to

---

[6] Tricompartmental arthritis is "a type of osteoarthritis that occurs in the knee. The knee can be divided into three compartments: the medial femoral-tibial compartment, found on the inside of the knee; the patellofemoral compartment, formed by the femur and kneecap; and the lateral femoral-tibial compartment, found on the outside of the knee.

Osteoarthritis (OA) can occur in any of the three compartments. When it occurs in all three, it's referred to as tricompartmental osteoarthritis. Tricompartmental OA is generally considered to be a more serious form of OA of the knee because a larger number of joints are affected. https://www.healthline.com/health/osteoarthritis/tricompartmental-osteoarthritis (last accessed July 3, 2019).

make any accommodation for the physical problems associated with that condition when formulating the RFC.

The ALJ acknowledged Ms. Pogany had treated for this impairment because she had been seen for pain and swelling in the left knee (AR29). The ALJ acknowledged Ms. Pogany's exam revealed she was unable to fully extend the knee, she had a "limping gait," and favored her left leg. AR28-29. The ALJ further acknowledged the tricompartmental arthritis diagnosis was supported by objective medical evidence in the form of an imaging study which confirmed the condition. AR28. The ALJ further recognized Ms. Pogany requires surgical intervention for the knee condition but in the interim, she relied on narcotic pain medication. AR29.

The ALJ did not acknowledge the many references in the record to Ms. Pogany's indication she cannot undergo surgical intervention because she cannot afford it/does not have any insurance. In brief, the Commissioner asserts the ALJ was justified in ignoring Ms. Pogany's knee problems in the RFC and that her inability to afford knee surgery is irrelevant because there is no evidence in the record that she applied for "county assistance" *and* because she had enough money to smoke cigarettes and drink one or two alcoholic beverages per week. Docket 23, p. 6.

The ALJ, however, did not express either of these reasons for discounting or ignoring Ms. Pogany's knee problems when formulating the RFC. Because the ALJ did not cite Ms. Pogany's purported willful failure to pursue free or

reduced-cost knee surgery *or* her allegedly frivolous spending of money of tobacco and alcohol, neither can the Commissioner do so on a *post hoc* basis. A court reviewing the Commissioner's decision may do so solely on the grounds invoked by the Commissioner. <u>SEC v. Chenery</u>, 332 U.S. 194, 196 (1947); <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001). In <u>Burlington Truck Lines, Inc. v. United States</u>, 371 U.S. 156 (1962), the Supreme Court addressed this issue. The Court noted the Administrative Procedures Act allows courts to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power. <u>Id.</u> at 167-68. In order for courts to make this determination, the agency must "disclose the basis of its order." <u>Id.</u> at 168. "The agency must make findings and support its decision, and those findings must be supported by substantial evidence." <u>Id.</u> Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision. <u>Id.</u> "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." <u>Id.</u> at 168-69.

Despite acknowledging Ms. Pogany's severe knee impairment and resultant pain level that requires narcotic drugs, the ALJ proceeded to formulate the RFC requiring Ms. Pogany to be on her feet 6 hours out of an 8-hour day, to climb ramps and stairs one-third of the day, and to stoop, kneel,

crouch and crawl one-third of the day.  AR27.   Ms. Pogany asserts this RFC is "wholly inconsistent" with the ALJ's observation that she has a severe knee impairment which results in knee pain and swelling, a limping gait, an inability to fully extend her knee, and the need to use narcotic pain medication.  The court agrees.

Ms. Pogany further asserts the primary reason for the disconnect between the recognition of the severe knee impairment and the lack of related physical limitations in the RFC is the ALJ's failure to properly evaluate the medical evidence.  This is the subject of the next section of this assignment of error.

**b.      The Commissioner's evaluation of Ms. Pogany's treating physician opinions**

Ms. Pogany asserts the limitations (especially as to her left knee severe impairment) assigned by the ALJ are not, as required by the regulations and case law, supported by "some" medical evidence.  Instead, she argues, the ALJ incorrectly evaluated the medical evidence and set its own expertise against that of the medical experts to formulate the RFC.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R.  § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

62

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' "[7]

_____

[7] Ms. Pogany's claim was filed in August, 2015. The court takes a moment, however, to observe that as to claims filed with the SSA after March 27, 2017, the CFRs regarding acceptable medical sources, medical opinions, and how the SSA must articulate the way it weighs the medical evidence, has been completely re-written. See 20 C.F.R. §§ 614, 1520c

For example, for claims filed after March 27, 2017, though a provider must still be an acceptable medical source to provide an opinion about the existence of a medical impairment, all medical sources may provide medical opinions on other issues. The SSA, however, will not be required to articulate

House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

---

any particular weight (including controlling weight) assigned to the medical opinions in the file. Instead, the ALJ will consider the "persuasiveness" of all medical opinions (not only the acceptable medical source opinions) using the factors specified in the regulations. Supportability and consistency will be the most important factors, and usually the only factors the ALJ is required to articulate. Compare: 20 C.F.R. § 404.1520c (applicable to claims filed on or after March 27, 2017) to 20 C.F.R. § 1527(c) (applicable to claims filed before March 27, 2017). See also: https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last checked July 1, 2019).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (citing Casey v. Astrue, 503 F.3d 687 at 691-692 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

Ms. Pogany asserts the ALJ's RFC (especially as to her knee impairment) is not properly supported because the ALJ formulated a functional capacity that was not supported by any medical opinion; instead the ALJ improperly substituted its own opinions for those of the medical experts. While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the

ALJ may not substitute its own opinions for those of the physician. <u>Finch v. Astrue</u>, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 946-47 (8th Cir. 2009). These principles were recently reaffirmed in <u>Combs v. Berryhill</u>, 878 F.3d 642, 647 (8th Cir. 2017).

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." <u>Id.</u> at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." <u>Id.</u> at p. 14.

As to her knee impairment, Ms. Pogany asserts the ALJ must have drawn its own inferences –in contradiction to her treating physicians' opinions--as to the limitations (or lack thereof) required by her severe knee impairment. She asserts the conclusions the ALJ reached could not have been drawn from any of the other medical opinions in the file. In support of this argument, Ms. Pogany emphasizes the following facts: (1) The State agency medical consultants, whose opinions the ALJ gave "greater" weight, found Ms. Pogany could stand 6 hours out of an 8-hour work day, frequently climb stairs and ramps, and frequently stoop, kneel, crouch and crawl. AR116-117; AR146, 149-50. (2) These limitations, however, were not based upon Ms. Pogany's

knee impairment, because it had not yet been diagnosed. Instead, those limitations were based upon Ms. Pogany's degenerative spine impairment. Id. (3) The knee impairment was not mentioned by the State agency physicians at the initial (February, 2016, AR113) or reconsideration level (June 22, 2016 AR146), but was diagnosed by Dr. Hiltunen in August, 2017, after an x-ray confirmed the condition. AR1595-96. (4) Dr. Hiltunen's medical source statement, dated November 7, 2017, limited Ms. Pogany to less than 2 hours standing/walking out of an 8-hour workday, and limited her push/pull to "rarely" because of her knee impairment. AR1772-73. He stated Ms. Pogany's knee impairment caused her to be able to only rarely climb, balance, stoop, kneel or crouch and that she should perform those activities only for ADLs (activities of daily living). AR1773. Ms. Pogany's treating physician added, "[t]here's no chance she could do any of these even at rare frequency." Id.

The ALJ gave "greater" weight to the State agency medical consultants but they knew nothing of Ms. Pogany's later-diagnosed knee impairment. So the ALJ did not formulate any knee-related limitations based upon the State agency medical consultants' opinions. But the ALJ specifically rejected Dr. Hiltunen's opinions about Ms. Pogany's knee-related limitations as "not consistent with [Ms. Pogany's] modest treatment." AR31. So, Ms. Pogany asserts, there is only one possibility left for the source of the ALJ's inferences about her need or lack thereof for physical limitations in the RFC related to her severe knee impairment: the ALJ's own interpretation of the medical reports.

In brief, the Commissioner observes that statements in medical records which post-date the State agency opinions support the ALJ's rejection of Dr. Hiltunen's proposed limitations. The Commissioner asserts the ALJ's failure to assign greater lower extremity physical limitations in the RFC was justified because at least some of Ms. Pogany's medical records, even after her left knee tricompartmental osteoarthritis was diagnosed, state she had good lower extremity strength and good range of motion.

The Commissioner's in-brief observation, however, is quite beside the point. The State agency medical consultants were not aware of the severe knee impairment so they offered *no opinion* about limitations, and Ms. Pogany's treating physician offered an opinion which indicated that extreme physical limitations were necessary as a result of the knee impairment. An ALJ may choose between properly submitted medical opinions, but is not permitted to "set his own expertise against that of a physician who testified before him." Combs, 878 F.3d 647; Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978)(the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

Ms. Pogany also alleges that as a general matter, the ALJ failed to properly consider the opinions of her treating physicians (Dr. Schurrer and Dr. Hiltunen) as to her other physical and mental conditions. The ALJ gave Dr. Schurrer's opinions (regarding both mental and physical limitations) "little weight." AR31. Dr. Schurrer treated Ms. Pogany at least since 2014. AR1070.

He began supporting her disability claim in that year when he completed FMLA paperwork for her.  AR1494.

In January, 2015, Dr. Schurrer stated Ms. Pogany's emotional issues were more important and cautioned her about returning to work.  AR1348. When she did return to work, Dr. Schurrer noted her increased pain and anxiety, and told her she might have to either look for a different type of work or consider not working at all.  AR1313.  By August, 2015, she had lost a job, started working again, tapered back to part-time again and filed for disability. AR1159.  Dr. Schurrer indicated he was in "total agreement" with her decision to file for disability.  Id.  He indicated the "huge strides" she had made with her back pain were aggravated by her attempts to work, and her psychiatric issues "only compound the problem."  Id.  In September, 2015, Dr. Schurrer again observed that increased work attempts would aggravate Ms. Pogany's anxiety— therefore he recommended  "limited" work attempts.  AR1128.

The reasons cited by the ALJ for giving Dr. Schurrer's opinion "little weight" were (1) Dr. Schurrer expressed concern about Ms. Pogany's narcotic drug dependence, but his opinion did not account for this; (2) the objective findings regarding Ms. Pogany's physical impairments are quite limited; and (3) Ms. Pogany's mental health has been "more or less" stable.  AR31. Ms. Pogany asserts that when these reasons are closely examined they are not "good reasons" as required by Hamilton, 518 F.3d at 610 and 20 C.F.R. § 404.1527(c)(2).  Furthermore, Ms. Pogany asserts, because the ALJ rejected or did not rely upon the State agency physician opinions and likewise rejected

or did not rely upon the treating physician opinions, it is impossible to discern upon what medical evidence the ALJ did rely in formulating the RFC.

As for the ALJ's first reason for discrediting Dr. Schurrer's opinion (Dr. Schurrer's failure to "account" for Ms. Pogany's drug dependence), Ms. Pogany asserts that because the ALJ did not further explain this comment, it is impossible to determine what the ALJ meant by it. Ms. Pogany theorizes the ALJ meant to imply Dr. Schurrer did not understand that drug addiction cannot be considered in the disability analysis. But, Ms. Pogany argues, it was the ALJ—not Dr. Schurrer--who did not understand how to conduct the proper analysis.

In 1996, Congress enacted what has become known as the Contract with America Act. As part of that legislation, the Social Security Act was amended to deny disability benefits to a claimant if alcoholism or drug addiction is a contributing factor which is "material" to the determination that the claimant is disabled. See 42 U.S.C. § 423(d)(2)(C). To determine if alcoholism or drug addiction is "material" to disability, the SSA inquires whether the claimant would remain disabled if the claimant stopped using drugs or alcohol. See 20 C.F.R. §§ 416.935(b); 404.1535(b). The focus of the inquiry is on the impairments which would remain assuming the claimant ceased the substance abuse, and whether the remaining impairments would be disabling in the absence of the claimant's substance abuse. Rehder v. Apfel, 205 F.3d 1056, 1060 (8th Cir. 2000).

In addition to the Code of Federal Regulations, the Social Security Administration has implemented a Social Security Ruling ("SSR") to assist in the interpretation of 42 U.S.C. § 423(d)(2)(C) and 20 C.F.R. §§ 416.935(b) & 404.1535(b). See SSR 13-2p. This interpretive policy explains how the SSA considers whether DAA is a contributing factor which is material to claimant's disability.

SSR 13-2p makes clear that the SSA's prohibition of consideration of a claimant's dependence on drugs in the disability determination does *not include* legally prescribed pain medication. See SSR 13-2p at Section 1.b: "How do we define the term "DAA"? That section states in relevant part:

> b. Substance Use Disorders are diagnosed in part by the presence of maladaptive use of alcohol, illegal drugs, prescription medications, and toxic substances (such as inhalants). For this reason, DAA does not include:
>
> **
>
> Addiction to, or use of, prescription medication taken as prescribed, including methadone and narcotic pain medications.

So Ms. Pogany is correct in her assertion that her dependence upon or even addiction to her prescribed narcotic medication would not have precluded her receipt of disability benefits pursuant to 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 416.935(b); 404.1535(b) and SSR 13-2p.

Dr. Schurrer's notes indicate he was concerned about Ms. Pogany's dependence on prescription narcotic medication. For example, in January, 2015, referring to her narcotic drug use, he noted there was a "significant connection with her psychologic frame of mind also." AR1337. He recommended that she may need treatment in a methadone program and said,

71

"unfortunately there is a significant connection to her psychologic frame of mind also." Id. When her anxiety increased as she was about to return to work, Dr. Schurrer said "I thought this might happen when it was time to return to work, I think her psych[e] is too fragile for her to return to work." AR1324. He opined returning to the same job would only magnify her problems. Id. He also said, "I'm not sure there is enough of any medication that is going to control her situational anxiety. She may be looking at disability due to psych reasons." Id. When she returned to work and had problems, Dr. Schurrer opined Ms. Pogany was dependent on her narcotic prescription and recommended a treatment program or a program with pain specialist, Dr. Cho. AR1313. By March, 2015, Dr. Schurrer had refused to prescribe more narcotic pain medication to Ms. Pogany, and recommended she not take Tramadol because of her psychiatric medication. AR1279.

The Commissioner suggests the ALJ's comment about Dr. Schurrer failing to "account" for Ms. Pogany's narcotic drug dependence was meant to convey that when Dr. Schurrer offered his opinions about Ms. Pogany's ability to work, Dr. Schurrer failed to acknowledge what he had recognized many times in his own records--many of Ms. Pogany's pain complaints must be tempered through the filter of her apparent addiction to pain pills rather than taken at face value, i.e. that it was her addiction, not her actual pain levels that fueled her need for the amounts of pain medication she was requesting. See Commissioner's brief, Docket 23, p. 11. In Haller v. Astrue, 2012 WL 2888801 at *10 (W.D. Ark., July 16, 2012), the court held the ALJ properly refused to

assign controlling weight to the treating physician's opinion because the physician failed to consider the claimant's drug seeking behavior.  Id.  See also Moore v. Astrue, 2010 WL 4628920 at *6 (W.D. Mo., Nov. 4, 2000) (ALJ properly refused to give deference to treating physician because he did not acknowledge claimant's drug seeking behavior motivated her to exaggerate her pain).

Both parties have offered a plausible explanation for the ALJ's reference to Dr. Schurrer's failure to "account" for Ms. Pogany's substance use, but the court is unable to discern which - if either - of those explanations is what the ALJ intended by its remark.   The court should not be left to speculate about the ALJ's intent.  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011).  The ALJ's statement that Dr. Schurrer "failed to account" for Ms. Pogany's substance use, therefore, does not qualify as a "good reason" for failing to credit Dr. Schurrer's opinion.

The next reason offered by the ALJ for failing to credit Dr. Schurrer's opinion regarding Ms. Pogany's physical limitations is that her physical limitations were not supported by the objective medical findings.  AR31.  Again, Ms. Pogany asserts the ALJ "provided no citation or basis in the evidence for those assertions." See claimant's opening brief, Docket 20, p. 11.  In light of the ALJ's assertion objective evidence is lacking, it would have been difficult for the ALJ to cite to evidence that did not exist.  Nevertheless, Ms. Pogany claims the

ALJ's observation was wrong because the record is replete with objective evidence of her physical impairments.[8]

For example, as to her degenerative lumbar disc disease (which the ALJ found to be a severe impairment) Ms. Pogany cites the following objective medical evidence:  A 2014 lumbar x-ray taken on April 20, 2014, which reveleted moderate, degenerative changes with moderate to marked disc space narrowing at L5-S1.  AR583, 649.  An MRI performed in 2014 which showed a disc protrusion at L4-5 extending into the foramen resulting in stenosis and a facet cyst that projects into the left foramen at that level.  AR794.  Finally, x-rays taken in April, 2015 which revealed mild to moderate lumbar spondylosis greatest at L5-S1 and facet arthropathy L3-L4 through L5-S1.  Dr. Nipe stated the x-rays showed "some degenerative change but no other significant findings."  AR737.  Ms. Pogany also directs the court to her treatment for back pain which included most everything short of surgery including nerve block injections, epidurals, trigger point injections, Toradol injections, use of a TENS unit, muscle relaxants, narcotic pain medications, nerve pain medications, treatment at a pain clinic, and a rhizotomy.  See AR1070-71; AR1499; 504; 793; 1058; 1061; 1054; 1453; 1429; 1378; 1121; 1040; 1030; 1645; 1638; 1643; 1632.

---

[8] The court discusses solely Ms. Pogany's lumbar disc disease impairment here because the ALJ's error regarding the weight given to the medical opinions regarding her knee impairment has already been evaluated above.

The Commissioner responds that despite these x-ray and MRI findings, many of Ms. Pogany's records revealed normal gait, normal strength, muscle tone, coordination, and range of motion. See Commissioner's brief, Docket 23, p. 12. The ALJ did refer to Ms. Pogany's gait in its decision (AR29) but that was in reference to her knee impairment, not her lumbar spine degenerative disc condition. Id. For the reasons explained above, the ALJ's rejection of the treating physician opinion about Ms. Pogany's knee impairment is not supported by "good reasons" because the ALJ drew its own inferences about the medical evidence rather than choosing among the medical opinions.

As for Ms. Pogany's normal strength, muscle tone, coordination, and range of motion, the references in the Commissioner's brief to these reasons for discounting the physical limitations in Ms. Pogany's RFC associated with her spine impairment are not made to the ALJ's decision, but to the parties' joint statement of facts. Again, the court may only consider the reasoning relied upon by the ALJ, not the Commissioner's *post-hoc* explanations. Burlington Truck Lines, Inc. 371 U.S. at 168-69; Chenery, 332 U.S. at 196; Banks, 258 F.3d at 824. When the court closely examines the *ALJ's* reasoning for assigning few, if any, physical restrictions in the RFC because of Ms. Pogany's spinal impairment, the only explanation offered as to the consistency between the objective medical evidence and her symptoms is as follows:

> The objective medical evidence supports that claimant has multiple impairments that are "severe." However, the objective signs, laboratory findings, and imaging studies do not support that the claimant would be more limited than set forth in the residual functional capacity. From a physical standpoint, the claimant is diagnosed with degenerative disc disease of the lumbar spine and

left knee tricompartmental arthritis. These are both demonstrated with imaging studies. April 2015 and January 2016 lumbar spine x-rays reflect mild degenerative changes and mild to moderate lumbar spondylosis, greatest at L5-S1. Left knee x-rays show moderately advanced tricompartmental degenerative disc disease.

Consistent with imaging studies, physical examination studies reflect that claimant has tenderness in the lower lumbar spine. Examinations have reflected that claimant's left knee is swollen and cannot be fully extended. A recent examination has shown that claimant has a limping gait, favoring the left leg, but earlier records do not consistently document gait abnormality. (Exhibit 16F, p. 13 AR1588).

AR28-29. ( other citations omitted). The ALJ explained the objective evidence *supported* that Ms. Pogany had severe impairments, but that the objective imaging did not support that she would be any more limited than the RFC it had formulated. That statement is circular.

To "support" this circular statement, the ALJ reiterated Ms. Pogany's tricompartmental knee arthritis and degenerative disc disease were *confirmed* by the imaging studies, repeated what those imaging studies were, then stated Ms. Pogany's physical exams were *consistent* with the imaging studies. AR28. The ALJ observed however, that earlier, unspecified physical exams had not consistently revealed a limping gait. But the ALJ cited to a medical record (AR1588) that **did** record a limping gait AR29. When the layers of the ALJ's statement supposedly connecting its conclusion about objective findings to the RFC are peeled back, it is clear this does not constitute a "good reason" for failing to credit Dr. Schurrer's opinions.

The ALJ's final reason for rejecting Dr. Schurrer's opinions concerns Ms. Pogany's mental impairments. The ALJ stated Ms. Pogany's mental health

had been more or less stable. AR31. Ms. Pogany asserts the ALJ's conclusion is not supported by substantial evidence because the ALJ rejected the State agency psychological physician opinions which concluded she had *no* severe mental impairments (AR98—initial level); (AR146—reconsideration level) and the only manner in which her mental impairments were "stable" was that they were consistently bad. Ms. Pogany had four mental impairments (anxiety disorder, PTSD, depressive disorder, narcotic dependence) which the ALJ acknowledged were severe. Ms. Pogany theorizes that because her mental impairments were severe, they were by definition (20 C.F.R. § 404.1520(c)) bad enough to cause significant limitation upon her ability to perform basic work activities. Furthermore, Ms. Pogany argues, Dr. Schurrer expressed concern many times about Ms. Pogany's mental health, and about the effect of her continued work attempts upon her mental health. Dr. Schurrer's opinion was consistent with the opinion of Ms. Pogany's treating counselor, Ms. Willis.

The Commissioner does not disagree with Ms. Pogany's argument that Dr. Schurrer supported Ms. Pogany's disability claim, or that Dr. Schurrer opined her attempts to work full-time aggravated her mental health condition. Docket 23, p. 10. The Commissioner argues, however, that the ALJ's rejection of Dr. Schurrer's opinion is supported by substantial evidence because, as noted by the ALJ in its opinion, Ms. Pogany's treatment records consistently stated she had fair insight and judgment and fair to good memory and attention. Additionally, the Commissioner argues, the ALJ noted Ms. Pogany did not exhibit psychosis, acute anxiety, tearfulness, or belligerence and she

maintained good control over her symptoms through her medications. All of these observations by the ALJ, the Commissioner argues, constitute "good reason" to reject Dr. Schurrer's opinion as to Ms. Pogany's mental impairment.

The Commissioner also argues Dr. Schurrer's opinions did not assign specific mental functional limitations but instead addressed issues reserved to the Commissioner, and are therefore entitled to no deference. Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 440. 1527(e). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 416.927(e)(3). The ultimate issues reserved to the Agency are as follows:

1. whether the claimant is disabled;

2. whether the claimant is able to be gainfully employed;

3. whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4. what the claimant's RFC is; and

5. what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)). The RFC determination is

specifically noted to be one of those determinations that are an ultimate issue for the Agency to determine.  20 C.F.R. § 416.927(e)(2); <u>Cox v. Astrue</u>, 495 F.3d 614 at 619-620 (8th Cir. 2007).

In the <u>House</u> case, the ALJ's decision disregarding the treating physician's opinion was affirmed, in large part because there were "profound" inconsistencies between the treating physician's opinion on the one hand, and the medical evidence and the claimant's own testimony on the other.  <u>House</u>, 500 F.3d at 744-745.  The ALJ had determined that the claimant suffered from a severe impairment that left him unable to perform his past relevant work, but that he retained the RFC to perform certain unskilled sedentary jobs.  <u>Id.</u> at 742.  The key issue as to the claimant's ability to perform unskilled sedentary work turned on whether he could sit for prolonged periods of time.  <u>Id.</u> at 743-745.  The medical records established restrictions on the claimant's ability to stand and walk, but not on his ability to sit.  <u>Id.</u>  The claimant's own statements in questionnaires and testimony at the hearing also indicated that his impairment affected his ability to stand and walk, but not to sit.  <u>Id.</u>  The treating physician's opinion that there were significant limitations on the claimant's ability to sit came only in response to a letter from the claimant's lawyer and only after the case had been remanded from the Appeals Council back to the ALJ for additional findings.  <u>Id.</u> at 743.  Under these facts, the ALJ was justified in finding that the treating physician's statement was inconsistent with the medical evidence on the whole.  <u>Id.</u> at 743-745.

In this instance, however, the ALJ did *not* indicate the reason it gave Dr. Schurrer's opinion "little weight" was because Dr. Schurrer offered his opinion on ultimate issues reserved to the Commissioner. That suggestion comes solely from the Commissioner in its brief. Again, the court may only consider the reasoning relied upon by the ALJ, not the Commissioner's *post-hoc* explanations. Burlington Truck Lines, Inc. 371 U.S. at 168-69; Chenery, 332 U.S. at 196; Banks , 258 F.3d at 824.

Here, the ALJ accepted that Ms. Pogany's mental impairments were severe, but rejected the consistent opinions of Dr. Schurrer and Kelli Willis because Ms. Pogany's mental health had been "more or less stable." Though the ALJ did not explain that comment, the Commissioner points the court to an earlier part of the ALJ's discussion where the ALJ noted Ms. Pogany's "cognition remains intact" and that Dr. Schurrer and other's exams did not reveal that Ms. Pogany exhibited extreme mental "signs and symptoms, like psychosis, acute anxiety or panic attacks, tearfulness, or belligerence." Docket 23, p. 14, citing AR30.

But those are not the criteria for measuring a claimant's mental ability to function in the workplace. The ability to function in the workplace is to be measured by the "B" criteria listed within each of the claimant's documented mental impairments (understand, remember or apply information; interact with others; concentrate, persist or maintain pace; adapt or manage oneself). See Appendix 1, Subpart P, Part 404, Listing 12:00.E-F; 20 C.F.R. § 404.1520(d). Again, therefore, when the layers of the ALJ's reasons for discrediting Dr.

Schurrer's opinions are peeled away, the court finds the ALJ's cited reasons were not "good reasons."

The ALJ gave "some" weight to the opinions of Ms. Pogany's other treating physician—Dr. Hiltunen—as to both her physical and mental impairments. AR31-32. Specifically, as to Dr. Hiltunen's opinions about Ms. Pogany's physical limitations (i.e. that she could only stand/walk 2 hours out of any 8 hour day and that she could never push/pull with her left leg, climb ladders, scaffolds, stoop or kneel, and that she could rarely climb ramps, stairs, or balance/crouch) the ALJ accepted the general proposition that Ms. Pogany was capable of light work, but rejected the more restrictive limitations on the use of her left leg as "not consistent with her modest treatment." AR31.

Though there are repeated references in her medical records to Ms. Pogany's lack of financial ability to seek the recommended surgical intervention for her knee impairment, and though Ms. Pogany spontaneously stated during the administrative hearing that she could not afford treatment, the ALJ made *no* follow-up inquiry to Ms. Pogany about her efforts to obtain free or low-cost treatment. See AR 42-87 (hearing transcript).

With regard to a claimant's infrequency of treatment or failure to follow prescribed treatment, the Commissioner's own rulings instruct that it will not find this factor to be contrary to the claimant's described symptoms unless the Commissioner first contacts the claimant for an explanation regarding lack of treatment, or asks the claimant for such an explanation at the ALJ hearing.

81

See SSR 16-3p.  The Commissioner specifically acknowledges a claimant may not seek treatment or may not follow prescribed treatment because she "may not be able to afford treatment and may not have access to free or low-cost medical services."  Id.  The Commissioner further teaches it is not enough for an ALJ to recite the [Polaski] factors.  Id.  Instead, the ALJ's opinion "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  Id.

The Commissioner has provided even more refined guidance for evaluating a claimant's failure to follow prescribed treatment.  See SSR 82-59.  When the Commissioner determines a claimant has failed to follow prescribed treatment, the Commissioner must also determine whether the failure to follow treatment was justifiable.  Id.  The treatment prescribed must be expected to restore the claimant's ability to work.  Id.  As with SSR 16-3p, the Commissioner promises in SSR 82-59 to give the claimant an opportunity to explain why she has not followed her doctor's advice and why that is important to the disability determination process:

> The claimant . . . should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.  The record must reflect as clearly and accurately as possible the claimant's . . . reason(s) for failing to follow the prescribed treatment.
>
> Individuals should be asked to describe whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed.

> The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits.

Id.

Depending on the claimant's explanation, the Commissioner counsels that it may be necessary to recontact the treating medical source to substantiate or clarify what the source told the claimant. Id. There are several claimant explanations for failing to follow recommended treatment that the Commissioner identifies as justifiable reasons. Id. Among those are inability to afford the treatment and lack of free community resources. Id.

Where an ALJ believes a claimant does not have justifiable reasons for refusing recommended treatment, the ALJ is supposed to advise the claimant *before* a determination of eligibility of benefits is decided; that way, the claimant can elect to undergo the treatment if desired. Id. This prophylactic measure is necessary for fundamental fairness because, once a disability application is denied, the claimant may not later undertake to follow the treatment recommendation and revise the adverse determination. Id. An ALJ may consider whether an examining medical source determines that the claimant was malingering in assessing the credibility of the claimant's testimony as to subjective complaints of pain. Clay v. Barnhart, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (two psychologists' findings that claimant was "malingering" cast suspicion on the claimant's credibility).

"If a claimant truly has no access to health care, then the absence of such care would not tend to disprove her subjective complaints of pain." Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004). However, in evaluating a claimant's subjective complaints of pain, it is permissible for the ALJ to consider whether she sought out treatment available to indigents. Id.

In this instance, the ALJ's sole reason for discounting Ms. Pogany's treating physician statement from Dr. Hiltunen regarding physical limitations was that it was "inconsistent with her modest treatment." This statement sheds very little light on why the ALJ considered Ms. Pogany's treatment insufficient in contrast to her impairments. More importantly, the ALJ's failure to ask Ms. Pogany either before, during, or after the administrative hearing about why she did not pursue more or different treatment renders ineffectual its sole reason for discounting Dr. Hiltunen's opinion.

The ALJ also gave little weight to Dr. Hiltunen's opinions regarding Ms. Pogany's mental impairment. Dr. Hiltunen assigned moderate limitations to Ms. Pogany's ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods of time; to complete a normal workday without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He also opined Ms. Pogany's ability to respond appropriately to changes in the workplace would be moderately limited. AR 1776-78. Dr. Hiltunen became Ms. Pogany's primary care provider for all purposes after Dr. Schurrer moved away.

Ms. Pogany explained she could not afford separate psychiatric care anymore.

See AR67 (transcript of hearing testimony).

The reasons offered by the ALJ for giving little weight to Dr. Hiltunen's opinion regarding Ms. Pogany's mental impairment are:

> It is not entirely consistent with the residual functional capacity and tends to reflect the claimant's current mental stability. However, the suggestion that she may have excessive absenteeism or require excessive breaks is not supported by the record.[9] Moreover, the undersigned concludes that reduction to simple, routine work would allow for her to maintain appropriate persistence and pace.

AR31-32.

As noted above, the court accepts the ALJ's interpretation that Dr. Hiltunen's indication Ms. Pogany was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and that she was moderately limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods can properly be translated into a limitation that she would have excessive absenteeism and need excessive breaks.

The problem lies in the ALJ's conclusion that Dr. Hiltunen's recommended limitations should be rejected because they are not supported by

---

[9] Ms. Pogany insists the ALJ's assumption that Dr. Hiltunen "suggested" she may have excessive absenteeism or require excessive breaks is not found anywhere in Dr. Hiltunen's opinion. The Commissioner insists those limitations can be gleaned from Dr. Hiltunen's indication Ms. Pogany had moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and that she was moderately limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. The court finds the ALJ's interpretations of Dr. Hiltunen's opinions are reasonable.

the record. The ALJ rejected the State agency physicians' opinions as to Ms. Pogany's mental impairment, because the ALJ disagreed with the State agency physicians' conclusions that none of Ms. Pogany's mental impairments rose to the level of "severe." Because the State agency physicians found Ms. Pogany had no severe mental impairments, they offered *no opinions* about what limitations would be appropriate to her ability to function in the workplace as a result of such mental impairments.

The only conclusion, therefore, is that the ALJ's rejection of Dr. Hiltunen's proposed limitations was *not* based upon the State agency physician opinions about what the appropriate limitations should be, but upon its own inferences drawn from medical evidence. It is well established that an ALJ may not substitute its own opinion for that of the physicians, and may not draw its own inferences as to the relevance of the medical records. Combs, 878 F.3d at 647; Strongson, 361 F.3d at 1070 (the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

Rather than seeking a medical opinion about the severity of Ms. Pogany's mental impairments should Ms. Pogany attempt or return to full-time employment, the ALJ drew its own inferences about that issue. This the ALJ is prohibited from doing. This the ALJ is not allowed to do, and does not constitute "good reason" to reject a treating physician's opinion. Combs, 878 F.3d at 646; Strongson, 361 F.3d at 1070.

### c. The Commissioner's determination of limitations imposed by Ms. Pogany's mental impairments

Ms. Pogany's final argument regarding the ALJ's formulation of her RFC is the mirror image of her argument regarding the weight given to the physician opinions. Ms. Pogany asserts the ALJ's determination of the limitations imposed by her mental impairments is not supported by substantial evidence. The ALJ's statement in the RFC formulation regarding Ms. Pogany's mental impairment states, "secondary to her mental impairments, the claimant is limited to performing simple, routine tasks. She can tolerate occasional and superficial contact with coworkers and the public." AR27.

Ms. Pogany asserts this statement fails to encompass the entirety of her mental limitations because the ALJ gave only "some" weight to Dr. Hiltunen's opinion as to her mental limitations, and rejected all other opinions in the record. Further, Ms. Pogany argues, the ALJ offered no explanation about how it translated the medical evidence in the record into the mental limitations in the RFC. In the absence of such an explanation, Ms. Pogany asserts the ALJ's formulation of the RFC as to her mental limitations is not supported by substantial evidence.

The Commissioner counters that the ALJ's formulation of Ms. Pogany's mental limitations is sufficient and supported by substantial evidence. The Commissioner asserts the ALJ's formulation of the RFC properly accounted for the sole medical opinion to which the ALJ assigned any significant (i.e. "some") weight—that of Dr. Hiltunen.

Dr. Hiltunen opined Ms. Pogany had moderate limitations in categories of 3 out of the 4 "B" criteria:  understanding and memory;  concentration, persistence or pace;  and adaptation.  <u>See</u> AR1776-78.  The Commissioner explains that pursuant to <u>Howard v. Massanari</u>, 255 F.3d 577 (8th Cir. 2001), the ALJ's assignment of a limitation to "simple, routine tasks" is sufficient to account for Dr. Hiltunen's indication that Ms. Pogany is moderately limited in concentration, persistence or pace.

But Ms. Pogany is correct in stating there really was no medical evidence supporting the ALJ's mental RFC, because the ALJ gave no weight at all to the state agency consultants' opinions, gave "little" weight to the opinions of Dr. Schurrer and Ms. Willis, and gave only "some" weight to Dr. Hiltunen's opinions.  In contrast to Dr. Hiltunen, the ALJ found Ms. Pogany had only mild limitation in understanding and remembering and applying information. AR25.  The ALJ agreed with Dr. Hiltunen that Ms. Pogany had moderate limitations in concentration, persistence or pace and in adapting or managing herself. AR26.

The ALJ did impose a limitation on Ms. Pogany's mental RFC to the effect that she should be limited to simple, routine and repetitive tasks.  AR17.  The question is, does that suffice to account for moderate limitations in understanding and memory; concentration, persistence or pace;  and adaptation?  The Commissioner argues the step three and step four analyses are separate and compartmentalized.  A finding of a limitation at step three

with regard to the listings need not carry over to the RFC analysis. This is only partially correct.

As stated above, in formulating RFC, the ALJ must consider all of a claimant's impairments, both those that are severe and those that are not. A finding at step three that a claimant has mental limitations does not "magically disappear when the analysis moves to step four." Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). However, just because a limitation is found at step three also does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four. Id. Instead, the limitations found at step three should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id. The question is whether substantial evidence in the record as a whole supports the ALJ's RFC formulation. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

In Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996), and Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997), the Eighth Circuit discussed whether an RFC which contained the limitation that the claimant was capable of "simple" work was sufficient to convey a deficiency in concentration, persistence or pace. In Newton, the record revealed the claimant had moderate deficiencies in his ability to carry out detailed instructions, maintain concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work week, and perform at a consistent pace

without an unreasonable number and length of rest periods.  <u>Newton</u>, 92 F.3d at 695.  Another physician's records indicated the claimant was markedly limited in his ability to carry out detailed instructions and moderately limited in his ability to maintain attention and concentration for extended periods.  <u>Id.</u> Consequently, the ALJ found the claimant "often" had deficiencies in concentration, persistence or pace.  <u>Id.</u>

On cross-examination, the VE admitted the claimant's concentration and persistence problems related to basic work habits needed to maintain employment.  "*A moderate deficiency in these areas, the expert testified, would cause problems on an ongoing daily basis, regardless of what the job required from the physical or skill standpoint.*"  <u>Id.</u> (emphasis added, punctuation altered).  Given this scenario, the court explained that merely describing the mental limitation as limiting the claimant to "simple" work was insufficient to encompass her moderate limitations in concentration, persistence and pace. <u>Id.</u>

In <u>Brachtel</u>, the court found that the limitation to "simple" work was sufficient to encompass the claimant's deficiency in concentration, persistence, or pace.  <u>Brachtel</u>, 132 F.3d at 421.   But in <u>Brachtel</u>, the court was careful to note the medical evidence did *not* suggest the claimant was deficient in all three areas, because the ALJ specifically noted the claimant in fact had very few deficits in concentration and had very good memory.  <u>Id.</u> at 421.  And the RFC hypothetical also specified the claimant could do repetitive work at no more than a regular pace.  <u>Id.</u>  The court held that this was just enough more

for the hypothetical to clear the bar, in contrast to the hypothetical in Newton. Id.

The court concludes the RFC hypothetical in this case falls on the Newton side of the bar. In this instance, the only medical opinion in the record to which the ALJ assigned any significant weight (Dr. Hiltunen) indicated Ms. Pogany was moderately limited in several areas within the concentration, persistence or pace criteria. She was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration, and to complete a normal weekday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (see AR1776-77). A limitation to "simple and routine work" does not sufficiently convey all of these limitations. For this reason as well, the RFC is not supported by substantial evidence.

### 2. The Commissioner's Step 5 determination regarding occupations Ms. Pogany is capable of performing

At step five, the ALJ found there were other jobs Ms. Pogany could perform within the RFC as formulated by the ALJ. AR33. The ALJ's conclusion was based on testimony from the VE that there were 64,000 garment sorter, 175,000 laundry worker, and 250,000 hotel housekeeper jobs available "nationally." AR83. By testifying to the number of jobs available in the entire United States, Ms. Pogany alleges the VE and the ALJ used the wrong standard. Her argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

> (d) "Disability" defined
>
> (1)The term "disability" means—
>> (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;
>
> * * *
> (2) For purposes of paragraph (1)(A)—
>> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." Id. (emphasis added). Now, what does that definition mean exactly?

The Commissioner cites several cases which seize upon the language in the statute which says it need not establish jobs exist in the claimant's *immediate area.* Yes. That is true, but it begs the question. The Commissioner *does* have to show that jobs exist in Ms. Pogany's "region" or in "several regions of the country." We know from the statutory language that "region" does *not* mean "immediate area," but defining what a term does not mean is not all that helpful in defining what it *does* mean.

The Commissioner's regulation, 20 C.F.R. § 404.1566, is likewise unhelpful. It does not define "region." Id. It says that "region" is not equal to "immediate area." Id. at (a)(1).

In Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region. This sentiment is paralleled in the Commissioner's regulation where it states: "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." Webster's New World Dictionary, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know

from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b). The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole. The court concludes, as it must, that "nationwide" does not truly mean "nationwide." Such is the nature of agency law. Instead, at Step 5, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation). Id.

The Commissioner cites Johnson v. Chater, 108 F.3d 178 (8th Cir. 1997), in support of the assertion that in the Eighth Circuit, "nationwide" does mean the entire country. But that is not what Johnson says. In the Johnson case, the claimant appealed the issue whether the VE's testimony was sufficient to prove that there were jobs existing in substantial numbers in the national economy. Id. at 178. The VE had testified that Johnson could perform sedentary, unskilled work such as being an addresser or document preparer. Id. at 179. The VE said that there were 200 such positions in Iowa and 10,000 such positions nationwide. Id. Johnson took issue with whether 200 positions in his home state of Iowa constituted "substantial" numbers of jobs. Id. at 180 n.3. The court rejected Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform." Id. at 180.

The facts in <u>Johnson</u> stand in stark contrast to the facts in Ms. Pogany's case. In <u>Johnson</u>, the VE testified to the number of jobs available in the claimant's *region* (in that case, his state), and also the number of jobs available in the whole country. <u>Id.</u> at 179. Here, the VE testified *only* to the number of jobs available "in the United States." AR83. As established above, both § 423(d)(2)(A) and § 404.1566 require more specificity than that. The ALJ and the VE must find that substantial numbers of jobs are available in Ms. Pogany's region or in several regions. <u>See Harris</u>, 356 F.3d at 931 (the ALJ must find at step five that claimant is "capable of performing work that exists in significant numbers within the *regional and national* economies.") (emphasis added).

The Commissioner also cites <u>Matthews v. Eldridge</u>, 424 U.S. 319, 336 (1976); <u>Miller v. Finch</u>, 430 F.2d 321, 324 (8th Cir. 1970); <u>Janka v. Secretary, HEW</u>, 589 F.2d 365, 370 (8th Cir. 1978); <u>Whitehouse v. Sullivan</u>, 949 F.2d 1005, 1007 (8th Cir. 1991); <u>Craig v. Chater</u>, 943 F. Supp. 1184, 1191 (W.D. Mo. 1996); and <u>Haller v. Astrue</u>, 2012 WL 2888801 at *11 (W.D. Ark. July 16, 2012), and for the proposition that the rule requires only that the Commissioner show appropriate jobs that exist in the national economy. The court has carefully examined each of these cited cases. While it is true each case proclaims the Commissioner must show that jobs exist in the national economy which the claimant can perform, none of them put a fine point on the precise meaning of that term of art, as explained above.

Instead, for example, in <u>Matthews</u> the court merely cited the "immediate area" language of 42 U.S.C. § 423(d)(2)(A) for the proposition that the Commissioner need not find a specific job vacancy in the claimant's "immediate area." <u>Matthews</u>, 424 U.S. at 336.[10]  The Court noted in footnote 14, however, that the term "national economy" was further defined by reference to a region or several regions.  <u>Id.</u> at n. 14.  Likewise, the <u>Janka</u> and Miller courts cited the "immediate area" language of the statute but did not address at all the meaning of "national economy."  <u>Janka</u>, 589 F.2d at 370; <u>Miller</u>, 430 F.2d at 324 (same).

In <u>Whitehouse</u>, the court cited the general proposition that the VE must find jobs the claimant can perform in the national economy, but did not discuss the meaning of that term as it is used in the statute.  <u>Whitehouse</u>, 949 F. 2d at 1007.  And in <u>Haller</u> and <u>Craig</u>, the courts cited 42 U.S.C. § 423(d)(1)(A) for the general proposition that the Commissioner need only find jobs available in the "national economy," but in both those cases, the VE specifically stated it had found jobs in a "region" which included the specific state in which the claimant lived.  <u>Haller</u>, 2012 WL 2888801 at *11; <u>Craig</u>, 943 F. Supp. at 1191.  Neither of those cases, therefore, support the concept that the term "national economy" does not require the commissioner to consider any geographical area smaller than the entire United States.

---

[10] For the reasons already explained on pages 92-93 of this opinion, that the Commissioner does not have to establish jobs exist in Ms. Pogany's "immediate area" does not end the inquiry about whether the Commissioner has met her burden to show jobs exist in the "national economy" as that term is used in the statutes and regulations.

The burden on is on the Commissioner at Step 5 of the sequential analysis. <u>Johnson</u>, 108 F.3d at 180. Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. Pogany's "region" or in "several regions" is an absence of evidence that cuts against the Commissioner. While this court might hazard a guess that there are substantial numbers of laundry worker and hotel housekeeper jobs available in South Dakota, or in the region consisting of South Dakota, North Dakota, Wyoming and Montana, or in several other regions in the country, this court is not allowed to guess about facts that might have been able to have been adduced at the agency level. The failure of proof requires remand to the agency to further develop the facts at Step 5.

**F.      Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Pogany requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative, reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the

Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

**CONCLUSION**

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED July 3, 2019.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge